IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GETTEE ARJANGRAD,

       Plaintiff,

                                     3:10-cv-01157-PK

                                     OPINION AND ORDER

JPMORGAN CHASE BANK, N.A., a
wholly-owned subsidiary of JPMorgan
Chase & Co., a Delaware corporation,

       Defendant.

PAPAK, Judge:

       Plaintiff Gettee Arjangrad brings this employment discrimination action arising from her

termination as a banker for defendant JPMorgan Chase Bank, N.A. ("Chase").  Arjangrad alleges

claims for national origin, race, religion[1], and sex discrimination under Title VII, 42 U.S.C. §

2000e, and Or. Rev. Stat. § 659A.030(1), race discrimination under 42 U.S.C. § 1981, common

law wrongful discharge, and retaliation under Title VII, 42 U.S.C. § 1981, and Or. Rev. Stat. §

---

     [1] Plaintiff's counsel has informally agreed to withdraw plaintiff's religious discrimination claim.

Page 1- OPINION AND ORDER

659A.030(f).  Now before the court are Arjangrad's motion to compel various types of discovery

(#25) and Chase's two separate motions to compel discovery related to Arjangrad's interaction

with her counsel and their fee agreement (#28) and Arjangrad's mental health treatment

information (#31).  For the reasons discussed below, Arjangrad's motion (#25) and Chase's

motions (#28, #31) are granted in part and denied in part.

### FACTUAL BACKGROUND[2]

Plaintiff Gettee Arjangrad was born in the United States, lived in Iran from age one-

month until age 17 and spoke Farsi as her first language.  (Spaulding Decl., #27, Ex. 3 at 25-26)

(First Arjangrad Dep.)  In 2007, she began working for Washington Mutual Bank as a Small

Business Relations Manager.  (First. Amend. Compl., ¶10.)  When Chase took over Washington

Mutual in 2008, Arjangrad continued to work for Chase as a business banker.  *Id.* at ¶12.  She

was highly regarded, single-handedly accounting for 60% of Chase's business banker production

in Oregon in 2008.  (Spaulding Decl., #27, Ex. 5 at 41-42.)  In September 2009, Arjangrad was

promoted from the Business Banking "channel" to the Relationship Management "channel"

where she worked with larger businesses and was supervised by Area Manager Russell Weldon.[3]

*Id.* at ¶13; (First Arjangrad Dep. at 11-12)  Weldon's supervisor was Regional Manager Jeffrey

Kunkel, who oversaw Relationship Management channels in the western United States.  (Lively

Decl., #42, Ex. 6 at 10) (Kunkel Dep.)  Weldon chose Arjangrad for promotion over two other

---

[2] The following is based on the allegations in plaintiff's amended complaint and the
limited evidence presented to the court on these motions; it does constitute a finding of fact.

[3] Weldon was hired as area manager for the Relationship Management channel by Jeffery
Kunkel shortly after Chase established that channel in Portland in August 2009.  Weldon was
selected for that position over Alice Johnston, Arjangrad's manager in the Business Banking
channel.

Page 2- OPINION AND ORDER

business bankers, James Taylor, an African-American male, and Elaine Harvey, a Caucasian female, all three of whom were recommended for the position by their Business Banking Area Manager, Alisa Johnston. (Lively Decl., #42, Ex. 8, at 27-28, 56-57); (Lively Decl., #42, Ex. 11.)

In mid-August 2009, after Weldon chose Arjangrad but before she was officially promoted, Weldon mentioned to Johnston that he was disappointed Taylor had not interviewed better, since Taylor was a "diverse candidate."[4] (Lively Decl., #42, Ex. 8, at 60-61.) During that conversation, Johnston told Weldon she was offended by his use of the term "diverse candidate." *Id.*, Ex. 8 at 69. Johnston also discussed Weldon's remarks concerning Taylor with Shalise Johnson, her immediate supervisor, who thought Weldon was a racist and that Weldon's failure to promote Taylor was evidence of his discrimination against Taylor. (Spaulding Decl., #27, Ex. 7 at 122-123.) During a meeting between Shalise Johnson and Weldon, Johnson raised the fact that Johnston had felt uncomfortable with Weldon's use of the term "diverse candidate." *Id.*, Ex. 5 at 64-65. After the meeting, Weldon called Catherine Kane, his Human Resources contact at Chase, to let her know about Johnston's concern. *Id.* Kane apparently already knew that there was a complaint about Weldon's use of the term "diverse candidate," and she coached Weldon to be more sensitive about using that term. *Id*; (Lively Decl., #42, Ex. 13) (Kane's notes). Johnson also apparently spoke with Weldon's supervisor Jeffrey Kunkel about Weldon's reference to Taylor as a "diverse candidate" (or "diversity candidate" as the term appears in Kunkel's notes).

---

[4] Johnston testified that Weldon also told her that he did not realize Taylor was going to be African-American and that Taylor did not carry himself like an African-American man, but Weldon denies making these statements. (Lively Decl., #42, Ex. 4 at 65-68); (Spaulding Decl., #27, Ex. 5, 62-63.)

(Lively Decl., #42, Ex. 12.) Kunkel then contacted Alisa Johnston directly to find out what

Weldon had said and why Johnston felt there was an issue. (Spaulding Decl., #27, Ex. 4 at 73-

74). Johnston told Kunkel that Weldon had spoken about diversity with regards to Taylor but not

the two other candidates, and Johnston felt that Taylor's diversity was a reason why Weldon did

not choose him for the position. *Id.* Kunkel assured Johnston that he would address the issue

with Weldon. *Id.* Indeed, Kunkel spoke with Weldon and coached him about his use of that

term in a manner similar to Catherine Kane. (Lively Decl., #42, Ex. 8 at 73, Ex. 12.) Finally,

Johnson contacted national Chase official Alice Rodriguez about the Taylor issue; Rodriguez

also discussed the topic with Marcus von Kapff, another national-level Chase manager.

(Spaulding Decl., #27, Ex. 7 at 65, Ex. 8 at 82-84.) Taylor himself never complained that

Weldon discriminated against him in the selection process.

On September 18, 2009, during a car trip to Medford, Weldon asked Arjangrad about the

origin of her name, thinking it was Indian. (Spaulding Decl., #27, Ex. 3 at 76.) Arjangrad told

Weldon that it was Persian and that she was from Iran. *Id.* According to Arjangrad, Weldon

became distant and cold and said, "You must hate men." *Id.* at 77. Arjangrad testified that

thereafter Weldon withheld an important new hire orientation training from her, treated her

differently from other Relationship Managers, and ultimately issued her an unjustified "needs

improvement" performance rating in December 2009. *Id.*, Ex. 3 at 73, 94, Ex. 21.

In contrast to Arjangrad's testimony, there is some dispute about the extent that Weldon

knew about Arjangrad's background before hiring her. Weldon testified that before hiring

Arjangrad he knew her name was "unique," but did not know she was Persian, grew up in Iran, or

spoke Farsi. (Spaulding Decl., #27, Ex. 5, at 46-47.) By contrast, Arjangrad's supervisor in

Page 4- OPINION AND ORDER

Business Banking, Alisa Johnson, testified that Weldon gave the impression that he had

discussed Arjangrad's background with her during her interview; the day after interviewing

Arjangrad, Weldon commented that she was Persian and had moved to the United States later in

life.  (Lively Decl., #42, Ex. 4 at 70-71.)

In December 2009, Arjangrad received a performance review for the period between

August 2009 and November 2009 and her overall rating was "Needs Improvement."  (Spaulding

Decl., #27, Ex. 21.)  She received a "Meets Expectations" rating on the categories of "Delivers

Results," "Process," "Risk Management," and "Service," but a "Needs Improvement" rating on

the categories of "Prospecting," and "Partnering."  *Id.*  Although the performance review form

suggested the overall rating was to be derived from Arjangrad's ratings on various performance

categories, testimony suggests that her overall rating was determined well before her evaluation

was written.  Apparently, bankers' overall ratings are set during an annual meeting in November

during which Kunkel and all his area managers collectively assign individual bankers either an

"Exceeds Expectations," "Meets Expectations," or "Needs Improvement" performance rating

according to a fixed region-wide curve, with 20% of managers in the region exceeding

expectations, 70% meeting expectations, and 10% needing improvement.  (Spaulding Decl., #27,

Ex. 6 at 133-134.)  These ratings then become the bankers' overall ratings on their annual

performance evaluations, which are written later.  *Id.* at 134-135, 137.  The assignment of

performance ratings on the 20/70/10 curve takes into consideration data about each banker's

performance throughout the year as well as the area manager's "working knowledge" of each of

their bankers; it combines both objective and subjective judgment.  *Id.* at 138, 140, 143.  The

performance data for each individual banker and his or her overall performance rankings are

Page 5- OPINION AND ORDER

collected in a spreadsheet by Lori Joseph and Heather Posey, both Chase administrators assisting Kunkel. *Id.* at 141-142. According to Kunkel, this process of assigning annual overall performance ratings is different from "stack ranking," a system in which area managers responsible for a single "market"-- Oregon for example-- rank their bankers from best to worst periodically throughout the year to give their region manager "a sense of how an area manager feels about their bankers." *Id.* at 131.

After receiving her "Needs Improvement" overall performance evaluation on December 22, 2009, Arjangrad wrote Weldon a lengthy email critiquing the review and Weldon's management practices. (Lively Decl., #42, Ex. 14.) Subsequently, a customer complained about Arjangrad's behavior with a business client's principal, alleging that Arjangrad had an inappropriate personal relationship with that individual and jeopardized Chase's relationship with the client. (Lively Decl., #42, Ex. 15.) Catherine Kane recommended Arjangrad be terminated, but Chase senior managers Julia Motes, Marcus Von Kapff, and Ann Leyden instead chose to place Arjangrad on a leave of absence pending investigation of the complaint. (Lively Decl., #42, Ex. 9 at 210.) The internal investigation apparently yielded inconclusive findings.

Over the course of her employment, Arjangrad made a number of complaints concerning her allegedly discriminatory treatment. She complained orally to Weldon during late October 2009, to Kunkel on December 17, 2009, to Catherine Kane on January 12, 2010, and to Tammy Parker, another Chase Human Resource official, on February 24, 2010. (Spaulding Decl., #27, Ex. 3 at 71-72, 95, 145, Ex. 15.) She complained in writing to Kane on January 12, 2010 and January 14, 2010. *Id.* at Exs. 12, 14. She filed a BOLI complaint on February 25, 2010 and emailed a copy of that complaint to Tammy Parker on March 3, 2010. (First Amend. Compl., ¶¶

Page 6- OPINION AND ORDER

21-22.)

After Arjangrad's call to Catherine Kane on January 12, 2010, Kane investigated

Arjangrad's complaint of discrimination by calling Arjangrad and Weldon on January 13, 2010.

(Spaulding Decl., #27, Ex. 4 at 40, 49-50, Ex. 11.)  Kane described Arjangrad's complaint as a

"he said she said situation," concluded that Arjangrad's allegation was questionable, and coached

Weldon about making sure his actions and comments were nondiscriminatory.  *Id.*, Ex. 4 at 50.

The next month, in describing the result of her investigation, Kane wrote that she dismissed

Arjangrad's discrimination complaint because Weldon had hired Arjangrad in August 2009

knowing that she would add diversity to his team.[5]  (Spaulding Decl., #27, Ex. 13.)

On February 1, 2010, Arjangrad returned to work under a final written warning requiring

"immediate and sustained improvement in professionalism and handling of internal and external

business relationships. . . ." (Lively Decl., #42, Ex. 20.)  Subsequently, Weldon recommended

Arjangrad be terminated.  (Spaulding Decl., #27, Ex. 4 at 94.)  On February 26, 2010, Kane met

with Kunkel and together decided to recommend terminating Arjangrad. (Spaulding Decl., #27,

Ex. 4 at 93.)  In a March 1, 2010 email, Kunkel wrote "in my seven years as a regional manager

Getee [Arjangrad] has been my most difficult behavioral challenge." *Id.*, Ex. 6 at 11-2.  Kane and

Kunkel's recommendation was passed to Chase senior management, including Julia Motes, Ann

Leyden, and Magaly Dennis-Roman, described as the ultimate decision-makers by Kane.  *Id.*  On

March 5, 2010, Chase terminated Arjangrad, citing her lack of performance.  (First Amend.

---

[5] Kane also later testified that Weldon told her that he had hired Arjangrad knowing she
would add diversity to his team, but Kane does not remember whether Weldon conveyed that
information in the fall of 2009 after Arjangrad's selection or on January 13, 2010, during Kane's
investigation of Arjangrad's complaint. *Id.*, Ex. 4 at 95, 101.

Compl., ¶23.)

## LEGAL STANDARDS

Federal Rule of Civil Procedure 26(b)(1) provides that a party "may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter." Fed. R. Civ. P. 26(b)(1).

I.     **Arjangrad's Motions to Compel Discovery Responses (#25)**

Arjangrad's motion to compel seeks five separate types of discovery: (1) materials and Chase communications surrounding the internal complaint made about Weldon's reference to James Taylor as a "diverse candidate;" (2) materials concerning other Relationship Managers (RMs) comparable to Arjangrad who worked in Chase's Seattle market; (3) materials concerning 2011 performance evaluations for Portland RMs; (4) "stack rankings" of all RMs in the West region for 2009 and the first quarter of 2010; (5) materials relating to the selection of Weldon for the Area Manager position over Alisa Johnston, Arjangrad's former supervisor.  I analyze each in turn.

a.     **Weldon's Reference to Taylor as a "Diverse Candidate"**

During oral argument, Arjangrad clarified that she sought materials pertaining to Chase's investigation of Russell Weldon's purportedly inappropriate reference to James Taylor as a "diverse candidate." In response, Chase confirmed that there was no documentation of such an investigation other than the two sets of hand-written notes memorializing Kane and Kunkel's discussions with Weldon about the issue that Chase has already produced.  Accordingly,

Arjangrad's motion is denied as moot as to RFP Nos. 35, 36, 37, 38, and 41.

    **b.    Comparable Chase Employees in Seattle Market**

    Arjangrad next argues that she is entitled to comparator data concerning all bankers Chase hired into the Relationship Management channel in Seattle in 2009 or 2010. I find that some portion of this requested discovery is relevant. Information concerning comparators from other regions also supervised by Kunkel, like RMs in Seattle, is arguably relevant to Arjangrad's claims against Kunkel.[6] *See Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir.2008) (similarly situated employee is one who "dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [her] conduct or the employer's treatment of [her]"). However, not all RMs supervised by Kunkel are appropriate comparators. Chase disciplined and terminated Arjangrad specifically for alleged performance failures and for inappropriate interactions with supervisors and clients. Thus, Arjangrad is only entitled to comparator information concerning Seattle RMs who also allegedly exhibited either of these same deficiencies. *See Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003) ("individuals are similarly situated when they have similar jobs and *display similar conduct*") (emphasis added);

---

    [6] Chase argues that Arjangrad asserts no discrimination or retaliation claims against Kunkel and thus, that discovery concerning other RMs in areas supervised by Kunkel is irrelevant. I disagree. In fact, Arjangrad's testimony supports at least gender discrimination and retaliation claims against Kunkel. Arjangrad testified that perhaps Kunkel did not appreciate that she was not constantly as "bubbly" and "delightful" as she appeared in her initial employment interview– a trait for which Kunkel commended her– suggesting that Kunkel discriminated against her based on a gender stereotype. (Lively Decl., #42, Ex. 1 at 87, 122.) Similarly, Arjangrad stated that Kunkel "did not like that I was being very direct about my national origin," and she felt that Kunkel retaliated against her for complaining of Weldon's national origin discrimination. *Id.*, Ex. 1 at 87, 121, 122.

Page 9- OPINION AND ORDER

*Paananen v. Cellco Partnership,* 2009 WL 3327227, at *9 (W.D. Wash. Oct. 8, 2009) (limiting

discovery to documents related to discipline and terminations for the particular employee

practices plaintiff allegedly engaged in, not all reasons for discipline or termination). Therefore,

regarding RFP Nos. 47, 51, and 52, I order Chase to produce records pertaining to Seattle RMs

hired in 2009 and 2010 who exhibited poor performance or inappropriate interactions with

supervisors or clients.

    **c.    2011 Performance Review**

    Next, Arjangrad seeks 2011 performance reviews for Portland RMs, arguing that even

events occurring after her termination are relevant to proving discrimination.[7] Chase, however,

insists that since 2011 performance evaluations were issued nearly two years after Arjangrad's

allegedly discriminatory December 2009 review, they cannot lead to relevant evidence.

Discovery of historical company records in Title VII cases are typically limited to "a reasonable

time period, both before and after the discriminatory event being alleged." *Sallis v. Univ. of

Minn.,* 408 F.3d 470, 478 (8th Cir. 2005) (internal quotation omitted). Some courts have

permitted discovery from years after the alleged discriminatory conduct, while others have

prohibited discovery of certain documents from a similar time-frame when other factors show

that the discovery is irrelevant. *Compare EEOC v. Lockheed Martin,* 05-00479, Nos.

SPK-LEK,05-00496 SPK-LEK, 2007 U.S. Dist. LEXIS 39342, at *13 (D. Haw. May 29, 2007)

(permitting discovery three years after alleged discrimination) *with Veliz v. City of Minneapolis,*

---

    [7] Chase points out that Arjangrad's discovery requests actually seek performance reviews
for *all* RMs in the United States, not just Portland RMs, as Arjangrad states in her motion to
compel briefing. I construe Arjangrad's brief as an informal modification of her request for
production, limiting the scope of requested discovery to just 2011 performance evaluations for
RMs in Portland.

No. 07-2376 (RHK/JJK), 2008 WL 4544433, at *1 (D. Minn. Oct. 9, 2008) (affirming on

reconsideration court's ruling that evidence of retaliatory statements nearly two years after

conduct giving rise to plaintiff's claims was both irrelevant and unduly prejudicial because the

length of time elapsed, the fact that the speaker was not a decision-maker in plaintiff's case, and

the lack of retaliatory comments made by individual who was decision-maker). Here, given the

small amount of additional discovery – at most, a year's worth of performance evaluations for a

few Portland RMs – Arjangrad's request is not unduly burdensome, especially considering the

Supreme Court's preference for broad access to discovery in Title VII cases. *See Wards Cove

Packing Co., Inc. v. Atonio*, 490 U.S. 642, 657 (1989) (in Title VII cases, "liberal civil discovery

rules give plaintiffs broad access to document their claims."). Therefore, regarding RFP Nos. 12

and 46, I order Chase to produce all 2011 performance reviews for Portland area RMs.

>    d.    **2009 Assignment of Performance Ratings for West Region RMs**

Arjangrad also moves to compel what she describes as "stack rankings" for all RMs in the

west region under the supervision of Jeffrey Kunkel for 2009 and the first quarter of 2010. As

described above, "stack ranking" of bankers within an area is different from assignment of

performance ratings within a region. Even though Arjangrad uses the term "stack ranking" in her

discovery requests, the details of those requests indicate she actually seeks documents relating to

the assignment of performance ratings. Thus, I construe Arjangrad's current motion as one to

compel meeting notes, emails, spreadsheets, and other documentation of the November 2009

process during which Kunkel and all the area managers in the west region assigned overall 2009

performance ratings for all RMs according to the 20/70/10 curve.[8]

It is clear that information pertaining to the November 2009 assignment of performance ratings is relevant to Arjangrad's claims, particularly the pretext stage in the *McDonnell Douglas* analysis. *See Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1220 (10th Cir. 2002) (irregularities in rankings relevant to pretext). Arjangrad's "Needs Improvement" performance rating in December 2009 was one of Chase's main justifications for her ultimate termination. Moreover, testimony reveals that the "Needs Improvement" rating was arrived at through a somewhat subjective group process involving Kunkel and Weldon according to a predetermined region-wide curve, not, as the instructions on the performance evaluation form suggest, by mathematically combining Arjangrad's scores on individual performance categories. Thus, Arjangrad is entitled to discover whether Kunkel and Weldon influenced the assignment of a "Needs Improvement"overall rating and, if they did, the extent that their reasons for assigning that rating conflicted with those stated in Arjangrad's later written performance evaluation. Consequently, regarding RFP Nos. 53 and 54, I order Chase to produce the spreadsheet created by administrators Lori Joseph and Heather Posey containing banker performance data and 2009 performance ratings for the western region RMs, notes from the 2009 meetings during which the ratings were assigned, and any communications created by or directed to Kunkel and Weldon relating to the 2009 meetings or region-wide assignment of performance ratings.[9]

---

[8] To the extent that depositions thus far suggest the region-wide assignment of performance ratings occurs only near the end of each year, it appears that no such discovery will be found pertaining to that process from the first quarter of 2010.

[9] I limit the discovery of communications to Weldon and Kunkel only, since Arjangrad produces no evidence suggesting other Chase officials who were also decision-makers in her termination were involved in this process. By narrowing the scope in this manner, I intend to

Page 12- OPINION AND ORDER

e.   **Selection Materials for Area Manager Position Given to Weldon over Alisa Johnston**

Finally, Arjangrad seeks documents relating to the 2009 selection of Weldon for the Portland Area Manager position, arguing that they could contain evidence of Kunkel or other senior Chase managers' discriminatory mind set or perhaps could provide an explanation for Chase's later failure to discipline Weldon for his allegedly discriminatory treatment of Arjangrad. I agree with Chase that this line of discovery is too far afield from Ajrangrad's claims and Chase's defenses in this case to satisfy even the liberal Rule 26 standard.  Accordingly, I deny Arjangrad's motion as to RFP No. 45.

II.   **Chase's Motion to Compel Arjangrad's Fee Agreement with Counsel and Other Information Relating to Her Representation (#28)**

In oral argument, Chase clarified that it seeks the date Arjangrad signed her fee agreement with counsel as well as the dates and times of any telephone or in-person meetings with her counsel for the purpose of receiving legal advice in the period relevant to this suit.  As explained in open court, I agree with Chase that this information is relevant to an affirmative defense of after-acquired evidence.  In essence, Chase could compare this discovery with Arjangrad's calendar and contact management database to determine whether Arjangrad inappropriately logged interactions with her counsel seeking legal advice as Chase sales calls.  In sum, regarding RFP Nos. 76 -78, Interrogatory Nos. 18-21, and Requests For Admission Nos. 97-101, I order Arjangrad to provide Chase with the date she signed a fee agreement with counsel, and the dates and times of any telephone or in-person communication with counsel seeking legal advice prior

_____

spare Chase an unbounded– and therefore expensive– search of email communications.

to her termination.

III.     **Chase's Motion to Compel Discovery of Arjangrad's Medical Information or**
         **Alternative Motion to Preclude Evidence of Arjangrad's Emotional Distress or**
         **Harm (#31)**

In this motion, Chase seeks information related to any potential treatment Arjangrad received from a psychotherapist, medical doctor, therapist, or counselor for anxiety or other mental health issue. Chase contends that Arjangrad has placed those records at issue, and therefore waived any applicable psychotherapist-patient privilege, by alleging she suffered a level of emotional distress as a result of Chase's conduct far beyond what courts often describe as "garden variety" emotional distress. Specifically, Chase points to Arjangrad's deposition testimony that she has lost "quite a bit" of confidence, keeps a "low profile," does not "meet with too many people," does not "go out very much" because she does not want to encounter former clients, and feels anxiety, especially when trying to apply for new employment. During oral argument, Arjangrad agreed in principle that she would place some limits on her introduction of evidence at trial concerning emotional distress in order to avoid waiving the psychotherapist-patient privilege. Although the parties could not agree upon a joint stipulation concerning the scope of Arjangrad's emotional distress evidence, Arjangrad proposed the following unilateral stipulation:

- Plaintiff will not introduce evidence though any witness that psychological symptoms impeded her ability to interview or search for other jobs;
- Plaintiff will not introduce evidence through any witness that she experienced any psychological symptoms after September 5, 2010 (six months from termination);
- Plaintiff will reduce her emotional distress damage prayer on all claims to $150,000;
- Plaintiff will provide the dates of treatment from any psychiatrist, psychologist or

Page 14- OPINION AND ORDER

mental health professional she has seen;
- Plaintiff will not rely on any treating psychotherapist or other expert to prove emotional distress damages;
- Plaintiff will not contend that she developed severe emotional distress;
- Plaintiff will not contend that any objective medical condition, or any severe or chronic psychological condition such as depression or agoraphobia, occurred as the result of Defendant's unlawful conduct;
- Plaintiff will not seek reimbursement for medical or psychiatric bills caused by Defendant's unlawful discrimination;
- Plaintiff will not plead a claim for intentional infliction of emotional distress.

While this proposed stipulation certainly limits Arjangrad's emotional distress claims, it does not go far enough for Arjangrad to avoid placing her emotional distress at issue and waiving the psychotherapist-patient privilege.

It is not yet settled in this Circuit the extent to which a plaintiff's claim of emotional distress damages constitutes a waiver of the plaintiff's psychotherapist-patient privilege. *Fitzgerald v. Cassil*, 216 F.R.D. 632, 636 (N.D. Cal. 2003). Courts have variously endorsed three different approaches: (1) the broad approach, where a plaintiff waives the privilege simply by alleging of emotional distress in a complaint; (2) the middle ground approach, where a plaintiff waives the privilege by alleging more than "garden variety" emotional distress, either by alleging a separate tort for distress or alleging unusually severe emotional distress; and (3) the narrow approach, where a plaintiff waives the privilege only by affirmatively relying on the psychotherapist-patient communication. *Fitzgerald*, 216 F.R.D at 636-638.

Chase recommends the broad approach, adopted by the court in *EEOC v. Cal. Pscyh. Transitions*, 258 F.R.D. 391 (E.D. Cal. 2009). I decline to follow *Cal. Pscyh. Transitions*, however, because there the court adopted the broad approach only because of the particular facts in that case. Since emotional distress damages were the only remedy sought by the EEOC on

behalf of one of the plaintiffs, they were the "crux" of her claim. *Id.* at 400. By contrast, here Arjangrad seeks many other remedies besides emotional distress damages.

Arjangrad prefers the narrow approach, ostensibly first endorsed in this district in *Thomas v. UPS Ground Freight, Inc.*, No. CV-06-1281-ST, 2007 U.S. Dist. LEXIS 97437 (D. Or. Feb. 15, 2007). There, Judge Stewart explicitly adopted the reasoning of *Fitzgerald* favoring the narrow approach and consequently examined whether the plaintiff would rely on psychotherapist-patient communication in establishing his emotional distress damages. Judge Stewart also borrowed from the middle ground approach, concluding that plaintiff did not waive the privilege in part because he alleged only garden variety emotional distress damages. *Thomas*, 2007 U.S. Dist. LEXIS 97437 at *6. I am persuaded by the wisdom of Judge Stewart's analysis, which combines both an inquiry into reliance on privileged communications and the nature of the alleged emotional distress. It is clear from Ajrangrad's proposed stipulation that she does not intend to rely on any psychotherapist-patient communication at trial. Therefore, I examine whether Arjangrad's allegations of emotional distress, in light of her proposed stipulation, constitute garden variety emotional distress damages.

Courts in this circuit define garden variety emotional distress as "ordinary or commonplace emotional distress," that which is "simple or usual," or "humiliation, embarrassment, anger, and other similar emotions." *Fitzgerald*, 216 F.R.D. at 637. Although some courts limit garden variety emotional distress to suffering experienced at the time of the alleged misconduct, others acknowledge garden variety emotional distress can encompass longer-lasting effects. *Compare Kim v. Interdent Inc.*, 2010 WL 1996607, at *1 (N.D.Cal. 2010) (contrasting garden variety emotional distress at the time of complained-of conduct with

"ongoing emotional distress damages") *with Sims v. Lakeside School*, 2007 WL 5417731, at *1 (W.D. Wash. Mar. 15, 2007) (garden variety emotional distress includes "depression, anger, irritability, sleep loss, discouragement, withdrawal, relived experience and low self esteem"). These disparate results can be explained by the well-accepted principle that whether a plaintiff's emotional response is "garden variety" depends on the harm to which that plaintiff was allegedly subjected. *See Kunstler v. City of New York*, 2006 WL 2516625, 9 (S.D.N.Y. 2006) (garden variety emotional distress is "the distress that any healthy, well-adjusted person would likely feel as a result of being so victimized"); *Flowers v. Owens*, 274 F.R.D. 218, 225 (N.D. Ill. 2011) (collecting cases with similar holdings). Here, I find that a normal person terminated from her employment in the manner alleged by Arjangrad could be expected to experience embarrassment, humiliation, anger, resentment, loss of confidence, and anxiety in applying for new employment. And those feelings reasonably could have persisted for as long as six months, the time period for emotional distress damages envisioned by Ajrangrad's proposed stipulation.

Arjangrad's allegations that she now avoids going out into public, however, is not a usual or ordinary response to the alleged discrimination she experienced. Even in cases where plaintiffs allegedly suffered more severe mistreatment than Arjangrad, courts find that an ongoing fear of venturing into public exceeds garden variety emotional distress. *See Flowers*, 274 F.R.D. at 227 (where plaintiff alleged in civil rights suit that he was beaten by guards in county jail, testimony that plaintiff was afraid to leave his home for fear of retaliation by local law enforcement went beyond garden variety emotional distress); *Menghi v. Hart*, 745 F.Supp.2d 89, 107 (E.D.N.Y. 2010) (where plaintiff allegedly received anonymous phone calls threatening rape, plaintiff's testimony that she was afraid to leave the house exceeded garden variety

emotional distress claims).

Since Arjangrad's proposed stipulation still allows her to introduce evidence that she avoids public interactions because of her termination, Arjangrad's emotional distress claims are not garden variety. Accordingly, Arjangrad places her mental health at issue and waives the psychotherapist-patient privilege. I therefore grant Chase' motion to compel, but only to the extent that Chase seeks information pertaining to Arjangrad's mental health treatment or medical treatment of physical conditions linked to mental health. Any medical records unrelated to mental health are not discoverable because they are irrelevant to Arjangrad's emotional distress allegations. *See Fitzgerald*, 216 F.R.D. at 634 ("pure" medical records are not relevant and therefore not discoverable because plaintiff makes no claim for bodily injury other than that directly linked to emotional distress).

## CONCLUSION

Plaintiff's motion to compel (#25) and defendant's motions to compel (#28, #31) are granted in part and denied in part as described herein.

IT IS SO ORDERED.

Dated this 19th day of October, 2011

Honorable Paul Papak
United States Magistrate Judge