IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


GETTEE ARJANGRAD,

       Plaintiff,

                                           3:10-cv-01157-PK
                                           OPINION AND ORDER


JPMORGAN CHASE BANK, N.A., a
wholly-owned subsidiary of JPMorgan
Chase & Co., a Delaware corporation,

       Defendant.

_____

PAPAK, Judge:

       Plaintiff Gettee Arjangrad brings this employment discrimination action arising from her

termination as a banker for defendant JP Morgan Chase Bank, N.A. ("Chase").  Arjangrad alleges

claims for national origin, race, and sex discrimination under Title VII, 42 U.S.C. § 2000e, and

Or. Rev. Stat. § 659A.030(1), national origin and race discrimination under 42 U.S.C. § 1981,

and retaliation under Title VII, 42 U.S.C. § 1981, and Or. Rev. Stat. § 659A.030(f).  (Sec.

Amend. Compl., #56.)  Now before the court is Chase's motion for summary judgment (#76).

For the reasons discussed below, Chase's motion is denied.


Page 1- OPINION AND ORDER

## FACTUAL BACKGROUND[1]

This case focuses on plaintiff Gettee Arjangrad's short period of employment as a

Relationship Management (RM) banker for Chase between September 10, 2009 and March 5,

2010, when she was terminated.

### I.    Banking Background

By all accounts, Arjangrad was a successful banker first with Washington Mutual

(WAMU) in December 2007 to September 2008 and then thereafter with Chase when it

purchased WAMU.  Arjangrad's role as a small business relationship manager with WAMU

focused on businesses valued at $3 million and above, involving more complex depository

issues, (Spaulding Decl., #92, Ex. 1, at 34) (First Arjangrad Dep.), but her role as a business

banker for Chase focused on companies smaller than $3 million. (First Weldon Dep. at 118-120.)

### II.    New Relation Management Channel

In the summer of 2009, Chase introduced a new banking unit in the Portland market, the

---

[1] The following recitation constitutes my construal of the evidentiary record in light of the
legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56.
That is, in construing the record I view the evidence and all factual inferences drawn from the
underlying facts in the light most favorable to the non-moving party, for purposes of the motion
now before the court only.  *See*, *e.g.*, *T.W. Electrical Service, Inc. v. Pacific Electrical
Contractors Asso.*, 809 F.2d 626, 630-631 (9th Cir. 1987) ("[A]t summary judgment, the judge
must view the evidence in the light most favorable to the nonmoving party:  if direct evidence
produced by the moving party conflicts with direct evidence produced by the nonmoving party,
the judge must assume the truth of the evidence set forth by the nonmoving party with respect to
that fact.  . . .  Inferences must also be drawn in the light most favorable to the nonmoving party.
Inferences may be drawn from underlying facts that are not in dispute, such as background or
contextual facts, . . . and from underlying facts on which there is conflicting direct evidence but
which the judge must assume may be resolved at trial in favor of the nonmoving party.")
(citations omitted).

Page 2- OPINION AND ORDER

Relationship Management (RM) channel, for companies with $3 to $10 million in sales or with complex or large lending needs.  (Spaulding Decl., #92, Ex. 6, at 117) (First Weldon Dep.).   The RM (sometimes called "relationship manager") position was different from the Chase business banker position in a number of respects, dealing with bigger, more complex clients.  (Lively Decl., #80, Ex. 1, at 46) (First Arjangrad Dep.).

Chase transferred Russell Weldon from Texas to become the area manager of Portland's new RM channel.  (First Weldon Dep., at 18-20.)  Weldon was previously an RM for six or seven years and spent two years as a "team lead," who provided coaching to three RMs but also reported to an area manager.  *Id.*  Weldon's manager in the new Portland RM channel was Jeffrey Kunkel, the region manager for West Region, who oversaw 13 area managers and 90 RMs.  (Spaulding Decl., #92, Ex. 12, at 9) (VonKapff Dep); (Spaulding Decl., #92, Ex. 8, at 13) (First Kunkel Dep.)   Above Kunkel was Marcus VonKapff, the National Executive who supervised nine regional managers.  (VonKapff Dep. at 7.)

### III.    Filling the Relation Manager Position

In seeking to fill an RM position, Kunkel and Weldon sought recommendations from Alisa Johnston, the supervisor of Chase's business bankers.  Johnston recommended three candidates– Arjangrad, James Taylor (an African-American male), and Elaine Harvey (a Caucasian female)– all from the business banker channel.  (First Kunkel Dep. at 63).  Taylor was Johnston's first choice because of his strong credit background.  (Spaulding Decl., #92, Ex. 10, at 49, 67) (Alisa Johnston Dep.)  Weldon and Kunkel interviewed the three candidates in August 2009  and decided to hire Arjangrad.  Weldon and Kunkel were not impressed with Taylor's

interview, reporting that he was too passive and not assertive and energized.[2]  (First Kunkel Dep., at 95); (First Weldon Dep at 59).  By contrast, Kunkel found Arjangrad to be assertive, energized, and committed, and told her during the interview that she was "delightful."  (First Kunkel Dep. at 88-90, 95.)  Weldon also believed Arjangrad had the proactive, fearless sales acumen necessary to drive results.  (Weldon Dep., at 78.)

At the time of her interview, Weldon "presumed" that Arjangrad was "culturally diverse" because of her ethnic-sounding name.  (Weldon Decl., #85, ¶3.)  Kunkel also determined that Arjangrad was "diverse" and "wasn't Caucasian" based on her accent, physical characteristics, and name[3], and assumed that Weldon had come to the same conclusion.  (First Kunkel Dep. at 117-118.)   There is no evidence, however, that either Weldon or Kunkel were aware of the exact origin of Arjangrad's name or the source of her accent during her interview.

## IV.    Beginning of Employment

Arjangrad was hired September 1, 2009 and officially transferred to her new position as an RM on September 10, 2009.  (Spauling Decl., #92, Ex. 32); (Lively Decl., #80, Ex. 1, at 17) (First Arjangrad Dep.)  She joined two other Portland RMs previously hired by Weldon: Robert Countryman and Cindy Klein.  (Lively Decl., #80, Ex. 20) (EEOC Charge).  Sometime in early September, perhaps on her first day at work, Arjangrad had a lunch with Weldon where she shared background information about employees working in Chase branches, including one

---

[2] Alisa Johnston, however, believed that Taylor's race was a factor in his being passed over for the RM position, based on Weldon's comments to her concerning Taylor's race and his being a "diversity candidate," and Johnston's supervisor's perception that Weldon was a racist. (P.'s Br., #119, n5.)

[3] Kunkel commented that her name suggested that "she was not Sally Jones from . . . Dubuque, Iowa."  (First Kunkel Dep., at 112.)

employee named Ray Lindley.  (Second Arjangrad Dep., at 106-107); (First Weldon Dep., at 97-98.)  Arjangrad knew that Lindley had an affair with a subordinate, but did not explicitly share that information with Weldon, instead suggesting that it was something Weldon would want to "talk to one of his branch managers about."  *Id.* at 107.  Weldon recalls Arjangrad explaining that Lindley was "a very hard manager, and if you got on his bad side there was no getting off."  (First Weldon Dep., at 99.)  Weldon found Arjangrad's disclosures about Lindley and others to be "unusual for a first day luncheon or any luncheon," and "divisive,"  although not necessarily "inappropriate."  *Id.* at 98-99.

Early on in her employment, Arjangrad also discussed her reservations about former WAMU colleagues with Cindy Klein. (Klein Dep., 63:24 - 67:5.)  Klein encouraged Arjangrad to discuss those concerns with Weldon or Human Resources.  (Klein Dep., 67:6-12.)  Klein also told Weldon that Arjangrad had "things of concern" to tell him about people in the market that Weldon should follow up with Arjangrad about.  (Klein Dep., 71:15 -18.)

## V.    Ethnicity Disclosed

On September 18, 2009, while driving with Arjangrad to Southern Oregon, Weldon asked Arjangrad the origin of her name, thinking it was Indian.  (First Arjangrad Dep. at 76.)  Arjangrad responded that her name was Persian and that she was from Iran.  *Id.*  Weldon "got very distant, very cold, and he immediately said, 'You must hate men.'"  *Id.* at 77.  Arjangrad felt that she had made a big mistake telling Weldon she was from Iran and tried to defend herself, saying that she actually does not hate men and is "a very doting wife to my husband."  *Id.*  Weldon never made another comment about her national origin or any negative comments about Iranians or Middle Easterners.  *Id.* at 78, 83.  Nevertheless, Arjangrad later reported that Weldon

treated her differently after disclosing that she was Iranian, a difference that was "clear as night

and day." (Spaulding Decl., #92, Ex. 4, at 37) (First Kane Dep.)

## VI.    Initial Pipeline Report

Around September 21, 2009, just a few weeks after starting as an RM, Arjangrad sent

Weldon her first "pipeline report," a document meant to reflect business prospects an RM is

actively and seriously pursuing. (Weldon Decl., #81, ¶10, Ex. 4); (First Arjangrad Dep. at 121.)

Weldon noted that several prospects in Arjangrad's pipeline report were problematic, including:

(1) two deals from a client Arjangrad originated while still working as a business banker; (2) a

small merchant services account without information about banking needs, complexity, or

revenue potential, that should have likely been referred to the Business Banking channel; (3) a

home construction contracting business, which is a high-risk industry unsuitable for the RM

channel; (4) "current client" needing a "cash management review" that Weldon though was

"premature" for the RM pipeline because no financial details about the client were included.

(Weldon Decl., #81, ¶11.) Two days later, on September 23, 2009, Weldon, Kunkel, Arjangrad,

Countryman, and Klien attended the first pipeline review meeting of the Portland RM channel.

(Weldon Decl., #12.) Weldon observed that Arjangrad had a weaker understanding of credit and

underwriting than her peers and determined that she should have training in those areas, later

approving her for a training in Advanced Financial Statement Analysis in October 2009. *Id.*

There is no indication that Weldon clearly explained to Arjangrad the deficiencies in her

first pipeline report. Arjangrad testified that RMs were expected to ensure that prospects were

qualified for the RM channel before they were added to an RM's portfolio, including

independently reviewing the prospect's financial information. *Id.* at 122. But, at first Arjangrad

Page 6- OPINION AND ORDER

found Weldon's expectations for pipeline reports "a little bit confusing for a while there," because he would initially instruct Arjangrad one way about what to include in the pipeline report, and then ask her to take out those entries during their weekly meetings. *Id.* at 89. Moreover, it is unclear whether Weldon explained to Arjangrad his expectations for the type of RM prospects she should pursue. Sometime during the first two months on the job, Weldon had a conversation with Arjangrad about what type of clients an RM should pursue, only specifying those roughly in the $3 -10 million range, and giving the impression that Chase was pushing "DDA accounts and just bringing in deposits and relationships" instead of loans. (First Arjangrad Dep., 18-19.)

## VII.  Feedback and Support

Arjangrad pursued individual feedback with Weldon on a weekly basis in her first 90 days because she felt singled out by Weldon. In response, Weldon gave her positive feedback such as "You're doing great. You're very good at what you do. Just keep doing what you're doing. . . . Just continue to do what you're doing." *Id.* at 119. At the time, Arjangrad found this feedback to be very positive, giving her the impression she was on track. (Second Arjangrad Dep. at 159-160.) In retrospect, however, Arjangrad wished Weldon would have taken the time to tell her what she was doing wrong instead. *Id.*

In general, Weldon failed to provide Arjangrad specific constructive feedback in her business development efforts. (First Arjangrad Dep., 119:25- 120:14.) For example, although Weldon helped Arjangrad prepare for a joint client call on September 28, 2009 and attended the client presentation with her, he gave her no specific instructions or forms to guide the planning process. (Weldon Decl., #85, ¶13); (First Arjangrad Dep., 119:25- 120:14.)

Page 7- OPINION AND ORDER

Weldon also reviewed credit deals with Arjangrad, but Weldon often acted "very dismissive" and told her to "call someone else." (Second Arjangrad Dep. at 88.)  In one instance, Arjangrad came to Weldon with a deal that satisfied the requirements for the RM channel but was "tough," which Weldon did not even want to look at.  *Id.* at 120.  Arjangrad told Weldon an underwriter had already seen the scenario and wanted to consider it. *Id.*  At Arjangrad's request, Weldon called an underwriter, who said that the deal might be doable and asked to review it. *Id.* at 121.  Arjangrad offered this as an example of Weldon not wanting to look at any of the deals she suggested.  *Id.*

## VIII.   Training

In October and November, Arjangrad attended what she described as several helpful trainings approved by Weldon. The "Advanced Financial Statement Analysis" in Seattle on October 1, 2009, was a "fantastic class" that gave her a "good idea into the credit [and] the underwriting at Chase." (First Arjangrad Dep at 105.)  Arjangrad completed several more trainings on October 12, 2009 and an online course on October 22, 2009.  (Lively Decl., #80, Ex. 19.)   She also attended an advanced cash flow analysis training in Seattle on November 2, 2009, along with RM Robert Countryman and a RM orientation BLC tour in Dallas on November 4, 2009 with Countryman and Klein.[4]  *Id*; (First Arjangrad Dep at 106.)

## IX.   Rankings

Sometime prior to October 23, 2009, Weldon ranked his RMs as part of the West Region's annual ranking process.  Weldon ranked Klein highest, followed by Countryman, and

---

[4] Klein later complained to Weldon that Arjangrad was mean to her and avoided her during the BLC tour.  (First Weldon Dep., 130:8-20.)

then Arjangrad.  (Weldon Decl., ¶16.)  Weldon based Arjangrad's ranking on her pipeline report,

her Contact Manager calls for October, observations of performance during pipeline review

meetings, sales meetings, client calls, and discussions, as well as Arjangrad's sharing of negative

information about colleagues and Klein's discomfort with Arjangrad's discussion of colleagues.

*Id.*  Indeed, in October Arjangrad had only logged 30 calls, while Countryman had 50 and Klien

41.[5]  (Lively Decl., #80, Ex. 22.)

## X.    Second Pipeline Report and Referral Assignment

Weldon asserts that in late October, two aspects of Arjangrad's performance continued to

be unsatisfactory.  First, on October 27, 2009, Arjangrad's second pipeline report contained some

of the same problems evident in her first report, including prospects that did not qualify for the

RM channel for various reasons– in high-risk industries, insufficient checking or cash

management needs – or lacked sufficient financial details.  (Weldon Decl., #85, ¶14.)  Second,

Arjangrad was behind on entering client contacts in Contact Manager, the computer program

used to record bankers' contacts with prospective and current clients, because she had just

returned from a week of vacation and only had access to Contact Manager since the beginning of

the month.  (Second Arjangrad Dep. at 39-40.)  On October 26, 2009, Weldon assigned referrals

to the three RMs as part of a "segmentation project" after checking that none of the other RMs

had previous contact with the prospective clients.  The next day, however, Arjangrad belatedly

---

[5] These call tallies may not tell the whole story, however, since Arjangrad testified that it was not until December that she became aware that both service calls and sales calls were to be logged into Contact Manager.  (Third Arjangrad Dep. at 53-54.)  In November Arjangrad recorded only 23 calls, but in December, the month she discovered that service calls and sales calls were to be entered, she far outpaced the other RMs with 46 calls– Countryman and Klien logged 27 and 23 calls respectively.  (Lively Decl., #80, Ex. 22.)

entered a prospective meeting with the client assigned to Klein (a client that Arjangrad said she

had already been in contact with) into Contact Manager and asked that the referral to that client

be assigned to her because of her prior relationship.  *Id.* at 37-38.  Weldon decided to let Klien

keep the client, *id.* at 38, based on his perception that Arjangrad did not have a prior relationship

with the client and that she had been attempting to claim the client even after the referral had

already been assigned to another RM.  (Weldon Dep. at 109-110.)

## XI.    Discrimination Complaints

Around the end of October and early November, Arjangrad had two conversations with

Weldon about her treatment at Chase.  On October 27, 2009, the same day that Weldon decided

to let Klein keep the client that Arjangrad purported to have developed, Arjangrad told Weldon

on the phone that she felt she was being "singled out," "treated unfairly," and that Weldon was

"not supporting" her.  (Second Arjangrad Dep. at 53.)  Weldon responded by calling Arjangrad a

victim.  *Id.* at 58.  A few days later, on November 2, 2009, Arjangrad visited Weldon in his office

and told him "I felt he had an issue with my background and my diversity and my national

origin."  *Id.*  In response, Weldon asked Arjangrad, "Why are you telling me this?"  *Id.* at 21, 70.

Arjangrad answered that she wanted to be treated fairly, to have an equal opportunity to succeed,

and that she was not receiving that opportunity.  *Id.* at 70.  Weldon "dismissed" her, although

Arjangrad does not remember exactly what he said to indicate their conversation was over.  *Id.*

After these discussions, Arjangrad noticed that things with Weldon got "progressively worse;"

he seemed to scrutinize her movements and hinder her progress.  *Id.* at 99-100.

## XII.    Refusal to Provide New Hire Training

In late October 2009, Arjangrad attempted to sign up for the November RM new hire

training in Seattle.  (First Arjangrad Dep. at 94-96.)  Arjangrad described the training as "absolutely very necessary for me to know how to do a lot of the processes that were necessary for the Chase RM channel." *Id.* at 99.  Robert Countryman had already taken that training in August 2009 before Arjangrad was hired and Arjangrad heard that several new hires from Seattle were planning to attend. *Id.* at 94-95.  After Arjangrad tried to enroll in the training online, Weldon told her that he was the only one who could approve her training and that he could not do so. *Id.* at 97.  Arjangrad followed up with Weldon about the training, and he said that she "wouldn't be going," without explanation and in a short and dismissive manner. *Id.* at 98.  Being refused approval for the new hire training made Arjangrad feel "singled out," since she perceived that all her colleagues who were hired at the same time were allowed to attend. *Id.* at 102.

In depositions, Weldon explained that because Arjangrad was an existing Chase employee, he thought credit analysis skills and "knowledge of the BLC" were more important than the new-employee training, which he described as "tantamount to an immersion in . . . culture."[6]  (Second Weldon Dep. at 30.)  Although Weldon did not remember Arjangrad requesting to attend the new-hire training, he insisted that other trainings were more important and suggested that the new-hire training was inappropriate because of her previous absences for vacation and out-of-town seminars. *Id.* at 38.

## XIII.   "Unique Challenges"

In his own performance self-evaluation completed November 6, 2009, Weldon indicated that he struggled with managing Arjangrad: "One RM provides unique challenges relating to her

---

[6] At the time, Weldon had not himself attended the new-hire training. *Id.* at 40.

capacity to function as a healthy member on a team.  This is expected to be  a challenge that will

play out during 2010." (Spaulding Decl., #92, Ex. 34.)  Weldon admitted that this comment

referred to Arjangrad.  (First Weldon Dep. at 125.)  Weldon testified that he based this comment

on Arjangrad's negative and backward looking attitude, her deficiency in prospecting,

particularly her tendency to consider "all comers" as prospects instead of using a disciplined

process to find clients within the RM channel's credit policy, and Klein's report to Weldon that

Arjangrad had been unkind to her during the Texas trip.[7]  *Id.* at 128-130.

## XIV.    Creation of the 2009 Review

Arjangrad's 2009 performance review became a key turning-point in her status at Chase.

In late November, Arjangrad submitted a self-review that reported strengths in negotiating and

selling relationships, while also acknowledging that she was improving in several other areas: "I

am currently working on fine tuning my new understanding of the sales process and the pipeline

report;" and "my input [in Contact Manager] is getting better and this will help me to keep better

track of my calls with my prospects and clients;" and "I will ensure that every credit that I will be

placing into my portfolio will be quality credit."  (Weldon Decl., #85, Ex. 10, at 2-3.)   Around

the same time, Weldon was preparing a written review for Arjangrad as well, which he sent to

Kunkel.  *Id.*, Ex. 11.  The narrative portion of the review about "Results" expresses some

concern about Arjangrad's production, which was "beginning to take a little traction but needs

much more," tempered with recognition that "it will take time to ramp up in the RM channel."

---

[7] Plaintiff spends a great deal of time providing details about Arjangrad and Klein's
relationship, opining that Weldon "fomented a rift" between them in his handling of the
"segmentation program," discussed above, the Texas business trip, and by telling Klein that
Arjangrad was gossiping about her.  (P.'s Br., #119, at 9-10.)

*Id.*, Ex. 11, at 2.  Weldon gave Arjangrad similarly mixed reports in other areas such as Process,

Partnering, Risk Management, and Service.  *Id.* at 2-5.  Weldon's overall comments highlighted

that Arjangrad was "a valued member of the Oregon RM Channel Team" but that "[t]here is

much effort needed to improve the sales process and enhance partnership to make hitting goal

[sic] more attainable."  *Id.* at 5.

Weldon initially planned to give Arjangrad, like the other two Portland RMs, a "Meets

Expectations" grade because he thought the RMs were too new to rate and there was no

significant expectation that RMs would be able to satisfy the "Delivers Results" category of the

review. (Weldon Decl., #85, ¶22.)  But Weldon readjusted his ratings after Kunkel asked Weldon

to "take a second look" at his ratings and redistribute the "Meets Expectations" ratings to help

the region-wide ratings conform to a pre-set curve of 10% "Exceeds Expectations,"  70%

"Meets Expectations," and 10% "Needs Improvement."   (Weldon Decl., #85, ¶22); (Kunkel

Decl., #78, ¶¶8-10.)  Weldon rated Klein "Exceeds Expectations," Countryman "Meets

Expectations," and Arjangrad "Needs Improvement" based on their respective prospecting,

process development, and partnering efforts.  (Weldon Decl., #85, ¶¶22-23.)  Kunkel agreed with

Weldon that Arjangrad was a "Needs Improvement" employee based on reports from Weldon

and Kunkel's own observations of Arjangrad during market visits and pipeline reviews.  (First

Kunkel Dep. at 155.)  Arjangrad's 2009 review, which she ultimately received on December 21,

2009, included "Meets Expectations" ratings in four categories (Delivers Results, Process, Risk

Management, and Service) and "Needs Improvement" ratings in two categories (Prospecting and

Partnering) with an overall "Needs Improvement" rating.  (Spaulding Decl., #92, Ex. 36.)

Page 13- OPINION AND ORDER

Although the review form stated that Delivers Results should be credited for 75% of the overall rating, Weldon testified that the Prospecting and Partnering areas were more important than Delivers Results.  (Spaulding Decl., #92, Ex. 36) (First Weldon Dep. at 169-170.)

## XV.    Complaint to Kunkel

Just days before Arjangrad received her 2009 review, on December 17, 2009, Arjangrad had an in-person conversation with Kunkel in which she reported Weldon's discrimination. After Kunkel observed a client meeting, Kunkel emphasized to Arjangrad the importance of a pre-call planning form she had not used.  (Second Arjangrad Dep. at 137.)  Weldon apparently had not told Arjangrad about this form.  *Id.*  Feeling "distraught," Arjangrad opened up to Kunkel and explained how Weldon's failure to tell her about this important form was an example of Weldon's withholding support and coaching from Arjangrad. *Id.* at 138, 147.  Arjangrad explained that ever since she told Weldon about her background and "where I'm from," Weldon talked down to her, treated her disrespectfully, discriminated against her, and treated her differently.  *Id.* at 138, 145.  Kunkel suggested to Arjangrad that the next time Weldon was not doing what he was supposed to do, Arjangrad should "just tell him to stop."  *Id.* at 139.  Kunkel encouraged Arjangrad to be direct and deal with Weldon herself, although Arjangrad had hoped that Kunkel would intervene. *Id.* at 139-140. Nevertheless, Arjangrad left her conversation feeling supported by Kunkel.  *Id.* at 140-141.

## XVI.    Response to 2009 Review

One day after receiving her review by email, on December 22, 2009, Arjangrad sent Weldon a four-page email protesting her review.  (Lively Decl., #80, Ex. 26.)  In the first

Page 14- OPINION AND ORDER

paragraph of the email, Arjangrad appears to provide a summary of her complaints, addressing

Weldon directly, referring to him in the second person as "you."  She expressed her

disappointment at "the numerous inaccuracies, false statements and information," and asking him

to provide data and examples to support his conclusions in the review.  *Id.*  Arjangrad also

critiqued Weldon for his lack of honesty in performance feedback, considering that he

consistently told her she was "on track."  *Id.*  Arjangrad asked Weldon do go through her

"specific response" below and wrote that she looked forward to their discussion later that day.

*Id.*  The rest of the email, refers to Weldon in the third person as "Russell" and mixes rebuttals of

Weldon's assessments in the 2009 review, criticisms of Weldon's management style, and

suggestions for re-writing the review.  Near the end of the email, Arjangrad offers Weldon some

"friendly feedback" regarding Weldon's use of the phrase "the failed hWAMU" in his comments

regarding Arjangrad's Partnering, warning that the phrase "clearly portrays a subjective and a

[sic] prejudice personal point of view regarding the old hWAMU and its employees who are now

part of JPMC" and pointing out that the phrase worked against Chase's significant efforts to

communicate how it values "the old hWAMU employees and relations."  *Id.* at 4.

Weldon was shocked at the email and considered it tantamount to a letter of resignation.

(Second Weldon Dep. at 16, 145.)  Kunkel wrote on his copy of the email

"Inflamatory/Insulting!" and found the tone to be inappropriate.  (First Kunkel Dep. at 162-163.)

Arjangrad, however, viewed the message to Weldon as an example of the direct communication

Kunkel had suggested she use with Weldon.  (Lively Decl., #80, Ex. 24.)   In an email from

Arjangrad to Kunkel just minutes after her email to Weldon, Arjangrad told Kunkel "I am

completely taking your advice and will discuss all issues with Russell [Weldon] objectively and I will stay focused on the solution." *Id.*

Kunkel suggested Weldon take Arjangrad to a public place for their discussion of her performance review "to keep emotions in check." (First Kunkel Dep. at 166.) Kunkel later explained that he was concerned that Arjangrad, who had gotten emotional and tearful at other meetings with Weldon, would be embarrassed having to leave Weldon's office in sight of her colleagues. *Id.* at 167. When Weldon and Arjangrad met at Marco's Restaurant, Weldon called Arjangrad "emotional" a number of times, mocked her, and interrupted her when she attempted to speak. (First Arjangrad Dep. at 112) ("if he would ask me a question and I would try to speak, he would just be like did, dit, dit, dit, you know, mockingly."). He also told her: "Why don't you just quit?" (Third Arjangrad Dep. at 57.)

Two days later, Arjangrad called Chase's HR hotline and spoke to Gay Zawatski because the "Marco's piece was just so over the top that I really wanted to talk to somebody about that incident." (Third Arjangrad Dep. at 33.) She did not complain to Zawatski about discrimination based on her background because she had already talked to Kunkel about it the week prior and expected that he was going to take care of it, and because she did not want "to go announcing it all over HR." *Id.* at 34. Later that day, Arjangrad emailed Kunkel and Zawatski explaining her concerns more fully, including Weldon's conducting a "confidential meeting regarding an annual review in a public place." (Spaulding Decl., #92, Ex. 41.) Arjangrad went on to describe how at the beginning of the meeting Weldon told her she was not allowed to speak and that when she tried to speak, he would stop her loudly and tell her she was being insubordinate. *Id.* Arjangrad

Page 16- OPINION AND ORDER

described Weldon as appearing very hostile, with shaking hands, and talking loudly.  *Id.*
Arjangrad stated she did not understand Weldon's motives for treating her so negatively, but also
reported Weldon showing "hostility towards me and others from hWAMU."  *Id.*   A few days
later, on December 27, 2009, Kunkel forwarded Arjangrad's email to National RM HR
representative Catherine Kane for further guidance on the situation.  (Lively Decl., #80, Ex. 27.)
Kane reviewed the email and spoke with Weldon and Kunkel about Arjangrad's review,
determining that it had been done fairly.  (First Kane Dep. at 145-146.)

## XVII.  Fraud and Misconduct Investigation

On December 31, 2009, a totally unrelated situation involving Arjangrad's prior work as
a WAMU business banker brought further attention from Chase management.  Although a full
account is unpractical here, a few details will suffice.  A Chase client ("DP") contacted Weldon
with a customer complaint relating to Arjangrad.  Weldon asked the customer to put the
complaint in writing.  The ensuing email complains of Arjangrad's failure to follow through with
various promises relating to DP's bank account and her jeopardizing Chase's relationship with
DP and DP's relationships with its own clients.  (Weldon Decl., #85, Ex. 24, 27.)  As part of the
complaint, the customer insinuated that Arjangrad's "improper relationship" with the former DP
president played a role in the company switching from U.S. Bank to WAMU, where Arjangrad
worked at the time, and suggested that Arjangrad's actions would be exposed in potential future
litigation.  *Id.* at Ex. 27.  The customer requested Weldon assign a different Chase banker, fix the
account problems, and reprimand or discipline Arjangrad "to the fullest extent possible." *Id.*  The
client also forwarded Weldon a series of emails between Arjangrad and the former president to

illustrate Arjangrad's "improper relationship."[8]  *Id.* at Ex. 26.  Weldon also spoke with someone related to the company who raised the allegation of potential embezzlement involving Arjangrad and the former president, which prompted Chase to assign a fraud investigator, Brenda Wakefield.  (Second Weldon Dep. at 177-179.) Weldon forward the complaint email to Kunkel and Kane; Kunkel wrote "Gettee's side of allegations?" and "code of conduct violation- immediate termination" on his copy of the email. (Spaulding Decl., #92, Ex. 45)

On January 7, 2010, Wakefield reported to Kane that there was no inappropriate activity by Arjangrad relating to the DP account.  (Spaulding Decl., #92, Ex. 46.)  On January 11, 2010, however, Wakefield placed Arjangrad on leave pending further HR investigation.  (Spaulding Decl., #92, Ex. 50.)  In response, Weldon told Arjangrad to take all of her belongings out of the office in front of her colleagues and told another RM that she had been fired for fraud.  *Id.* ; (Lucia Decl., #114, ¶4.)  That day, Wakefield interviewed Arjangrad, who explained that in August 2009, when a DP employee accused her of having an affair with the former president, she denied the allegation by email and copied her husband and the former DP president.  (Spaulding Decl., #92, Ex. 48.)  The allegation of an affair appears to have been made by a girlfriend of the former DP president, who now worked at DP. (Spaulding Decl., #92, Ex. 23.)   Wakefield reported her findings in a phone call to Kane the same day[9]; Kane placed importance on Wakefield's conclusion that Arjangrad tried to handle the DP employee's allegations of the affair

---

[8] The emails reveal fairly overt flirting by the former president and responses from Arjangrad that are informal, friendly in tone, but do not match the president's clearly romantic/sexual insinuations.

[9] The next day, January 12, 2009, Wakefield provided a written summary of her findings to Kane, Kunkel, and Weldon.  (Spaulding Decl., #92, Ex. 49.)

on her own instead of seeking assistance from a manager. (Second Kane Dep. at 98-100.) Kane viewed Arjangrad's failure to bring in management as putting the bank's relationship with the client at risk. *Id.* at 101.

Based on her January 11, 2010 conversation with Wakefield, Kane started thinking about terminating Arjangrad. (First Kane Dep. at 211.) Sometime afterwards – it is unclear exactly when– Kane, Kunkel, and Weldon decided to recommend terminating Arjangrad, based variously on the results of the Wakefield investigation finding Arjangrad failed to involve a manager to respond to the allegation of an inappropriate relationship (First Kunkel Dep. at 189), (Second Kane Dep. at 108-109), (Second Weldon Dep. at 135-136), Arjangrad's poor judgment in the allegedly flirtatious emails between Arjangrad and the former DP president, (First Kunkel Dep. at 192), (First Kane Dep. at 228-229), and Arjangrad's December 22 email to Weldon. (Second Weldon Dep. at 135-136).

## XVIII.        Written Complaints and Kane Investigation

On January 12, 2010, the day after her interview with Wakefield and within an hour of Wakefield providing her written findings to Kane, Arjangrad wrote to Kane and Kunkel reporting Weldon's treatment of her in the course of the investigation as "another indication of Russell [Weldon's] continued vendetta and discriminating behavior against me . . . ." (Spaulding Decl., #92, Ex. 50.) Kane's investigation of this complaint consisted of calling Arjangrad and Weldon the next day. (First Kane Dep. at 40-41.) Kane called Arjangrad and told her that her complaint of national origin[10] discrimination was "a very serious allegation," making Arjangrad feel that

---

[10] Kane testified that Arjangrad's email only alerted her that Arjangrad was complaining of "discrimination," not specifically national origin discrimination. (First Kane Dep. at 69-70);

she had done something wrong by complaining.  (Second Arjangrad Dep. at 102); (Third

Arjangrad Dep. at 95.)  Kane called Weldon, who reported that his relationship with Arjangrad

changed after the segmentation project, when Arjangrad claimed a prior relationship with Klien's

client that Weldon could not verify.   (Second Kane Dep. at 44.)  Weldon said that Arjangrad told

him he had an issue with "her name;" when he asked her what she meant, she did not respond.

*Id.*  Kane characterized Arjangrad's complaint as a "he said she said situation," concluded that

Arjangrad's allegation was questionable, and after conferring with Kunkel, coached Weldon

about making sure his actions and comments were appropriate and non-discriminatory.[11]  *Id.* at

50-51.  The next day, January 14, 2010, Arjangrad emailed Kane clarifying that she believed

Weldon was treating her differently ever since she told him the country where she was from and

reiterated that she had already reported the discrimination to Kunkel on December 17, 2009.

(Spaulding Decl., #92, Ex. 54.)

On January 15, 2010, Kane prepared a document entitled "Gettee Arjangrad Issues"

summarizing performance problems, her poor judgment in handling the relationship with the

former president of the client, and her poor judgment in responding to Weldon's performance

review.  (Spaulding Decl., #92, Ex. 56.)  A document dated January 19, 2010, includes those

same points and ends with a recommendation for termination "based on issues cited above."

(Spaulding Decl., #92, Ex. 57.)

_____

(Second Kane Dep. at 125-126.) But Kane admitted that Arjangrad's phone call raised the issue
of national origin discrimination.  (First Kane Dep. at 40); (Second Kane Dep. at 126-127.)

[11] Several weeks later, on February 5, 2009, Kane wrote that she had dismissed
Arjangrad's discrimination complaint because Weldon had hired her in August 2009 "knowing
that she would add diversity to his team."  (Spaulding Decl., #92, Ex. 73.)

Sometime in the time period after January 11 and before January 20– again it is unclear when– Kane called her manager, Julia Motes, and RM National Executive Marcus VonKapff, communicating the gist of the situation with Arjangrad.  *Id.* at 211-212.   Evidence suggests that some, if not all, of these calls occurred after Arjangrad's written discrimination complaint of January 12, 2010, because VonKapff recalled Kane alerting him to Arjangrad's complaint of discrimination during the first of his several conversations with Kane about the subject. (Spaulding Decl., #92, Ex. 12) (VonKapff Dep. at 69.)  Finally, on January 20, 2010, Kane spoke with Anne Leyden, head of HR for retail banking, discussing Arjangrad's performance issues, 2009 review, professionalism with management, and allegations of an inappropriate relationships.   (First Kane Dep. at 215-216); (Spaulding Decl., #92, Ex. 15) (Leyden Dep.); (Spaulding Decl., #92, Ex. 118).   As a result of these conversations, on January 22, Kane was informed that Leyden wanted Kane to put Arjangrad on a written warning instead of terminating her.  (First Kane Dep. at 217.)

## XIX.   Written Warning

Kane, Kunkel, and Weldon met on January 22, 2010 to discuss the details of Arjangrad's return to work.  Weldon's notes from that conversation indicate that Chase management was preparing to document Arjangrad's failings.  Under a heading of "Problems," Weldon wrote "[sic] Aggregious- report right away," "L'il stuff- document" and "corrective action policy - no improvement is grounds."   (Spaulding Decl., #92, Ex. 61.)  On January 29, 2010, Arjangrad signed a written warning allowing her to return to work.  (Spaulding Decl., #92, Ex. 67.)  The warning provided 11 performance goals, but did not specify a timeline by which Arjangrad had

to achieve them. *Id.* Arjangrad perceived that the goals had to be met within 60 days and found that it would be impossible to generate the type of new business required by the goals in the time period, given the time it took new credit deals to clear. (Third Arjangrad Dep., 93:10-13.) The warning restriction period was set to expire on March 31, 2010, but the warning also provided that corrective action, including termination, could be taken at any time if Arjangrad did not make sufficient progress towards the listed goals. (Spaulding Decl., #92, Ex. 67.)

## XX.    Return to Work

Arjangrad returned to work on February 1, 2010, and in her first week acted pleasantly and expressed her strong motivation to do anything necessary to succeed. (Spauldin Decl., #92, Ex. 72); (Third Arjangrad Dep., 150:11-18.)  The day she returned, Weldon reviewed Arjangrad's pipeline with her, but found she continued to lack supporting financial details for her prospects. (Weldon Decl., #85, ¶45.  Upon her return, Arjangrad's met weekly with Weldon and Kunkel, focusing on her prospecting efforts. (Third Arjangrad Dep., 148: 17-24.) Arjangrad described these coaching sessions as "more beat-up sessions." *Id.* at 152:15 -153:13. Although Kunkel would start the meetings by asking how he could help Arjangrad, when Arjangrad described a prospect Kunkel would "completely tear it apart" even though Arjangrad had previously vetted the prospect with Weldon. *Id.* Also, Kunkel failed to coach Arjangrad on how to improve, instead "going on and on about that I'm not doing anything right, that I had an attitude problem, that I didn't like my job, that I didn't look happy." *Id.*

Soon after Arjangrad's return, Weldon began to extensively document Arjangrad's deficiencies. On February 5, 2010, he created a list of a number of "areas of concern" involving

various of Arjangrad's banking clients and prospects.  (Spaulding Decl., #92, Ex. 72.)  Weldon

created a spreadsheet entitled "Coaching Notes" listing, categorizing, and describing almost daily

issues with Arjangrad's performance, and apparently expanded it into another spreadsheet also

categorizing the type of Arjangrad's "behavior" and his "response."  (Spaulding Decl., #92, Exs.

75, 76.)  Weldon also took extensive notes during Arjangrad's coaching sessions.  (Spaulding

Decl., #78.)  Weldon's spreadsheets make no mention of any positive aspects of Arjangrad's

performance.  (First Kane Dep., 179:16-18.)  Weldon acknowledged that these spreadsheets were

his attempt to document the "little stuff" concerning Arjangrad's performance.  (Second Weldon

Dep., 202:15-21.)

Arjangrad also felt that Weldon was interfering with her ability to succeed and expressed

this concern in an email to Kane, after noting that Chase was not taking her discrimination and

retaliation complaints against Weldon seriously.  (Spaulding Decl., #92, Ex. 69.)  In particular,

Weldon took away several of Arjangrad's accounts. (Second Weldon Dep., 225:23- 226:5.)

Weldon also apparently pressured a bank manager, Mark Williams, to request Klein be

substituted for Arjangrad to attend a meeting with a client.  (Spaulding Decl., #92, Ex. 72, at

JPMC 001276-1277); (Williams Decl., #115, ¶3.)

Meanwhile, Chase found Arjangrad's performance and attitude to be inferior.  Weldon

received complaints about Arjangrad from clients and found her prospects to be inappropriate.

(Weldon Decl., #85, Exs. 40, 42, 45.)  Arjangrad also ranked last among Portland RMs in the

number of client calls in February.  (Lively Decl., #80, Ex. 44.)  Kunkel found Arjangrad to be

increasingly argumentative in coaching sessions, to the point that Arjangrad finally confronted

Page 23- OPINION AND ORDER

Weldon and Kunkel, calling the sessions "worthless" and saying that she felt that she was being "ganged up on." (First Kunkel Dep., 42:6-21.)

On February 16 and 17, 2010, Arjangrad and Weldon attended the RM new hire orientation in Chicago. Although Weldon initially requested not to travel to the training with Arjangrad because of her "attendance, her irrational and insubordinate response to my written review and other allegations she has made against me," Kunkel insisted he attend. (Spaulding Decl., #92, Ex. 65); (Second Kunkel Dep., 87:9-16.) Arjangrad found the training to be excellent, but Weldon wrote notes critiquing Arjangrad's level of participation and demeanor during the training. (Spaulding Decl., #92, Exs. 76, 80.)

## XXI. Termination

Immediately after Arjangrad's February 26, 2010 coaching session, Weldon and Kunkel decided to terminate Arjangrad and informed Kane of their decision. (First Kunkel Dep., 82:1-11.) The same day, Weldon drafted a recommendation for termination citing a number of reasons, including Arjangrad's escalating lack of professionalism with him and Kunkel, her lack of understanding of RM prospecting and credit principles, her lack of integrity with other bankers, and her unwillingness to learn from more successful RMs and other managers. (Spaulding Decl., #92, Ex. 83). Weldon concluded that termination was justified in light of Arjangrad's comments that she was just "going through the motions" in weekly coaching sessions, her "obstinacy in communicating with management," and "the continued behaviors leading to the Written Warning." *Id.* On March 1, 2010, Kunkel concurred with Weldon's recommendation. (Spaulding Decl., #92, Ex. 84.) On March 3, 2010, Weldon created a new

version of the recommendation for termination highlighting Arjangrad's argumentativeness and failure to show improvement on the issues identified in the Written warning. (Spaulding Decl., #92, Ex. 85.)  That same date, Chase received a copy of Arjangrad's BOLI charge.  (Spaulding Decl., #92, Exs. 88, 89, 118.)  On March 5, 2010, Kane apparently edited Weldon's March 3, 2010, request for termination listing Arjangrad's almost negligible production numbers since February 1, 2010.  However, Kane neglected to change the date of the document or its authorship.  (Spaulding Decl., #92, Ex. 93, Ex. 118, at JPMC 004537.)  Neither Weldon, Kunkel, nor Kane could explain where the production numbers came from.  (Second Weldon Dep., 157:24- 158:4); (Second Kunkel Dep., 81:17-82:3); (Second Kane Dep., 67:23- 68:14).  Other Chase documents that appear to track somewhat different production metrics and periods show Arjangrad with the second-highest RM production, behind Robert Countryman.  (Spaulding Decl., #92, Exs. 94, 95.)  Later on March 5, 2010, Chase terminated Arjangrad.  (Spaulding Decl., #92, Ex. 118, at JPMC 004538.)

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  Summary judgment is not proper if material factual issues exist for trial.  *See, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 116 S.Ct. 1261 (1996).  When considering a motion for summary judgment,

Page 25- OPINION AND ORDER

the district court's role is not to weigh the evidence, but merely to determine whether there is a genuine issue for trial. *Liberty Lobby*, 477 U.S. at 249; *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997).

A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. Only after the moving party has made such a showing does the burden shift to the opposing party to show that a genuine issue of fact remains. *See* Fed. R. Civ. P. 56(e).

To establish the existence of a genuine issue of material fact, the non-moving party must make an adequate showing as to each element of the claim on which the non-moving party will bear the burden of proof at trial. *See Celotex,* 477 U.S. at 322-23; *see also Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). The opposing party may not rest on conclusory allegations or mere assertions, *see Taylor*, 880 F.2d at 1045; *Leer v. Murphy*, 844 F.2d 628, 631 (9th Cir. 1988), but must come forward with significant probative evidence, *see Liberty Lobby*, 477 U.S. at 249-50; *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). The evidence set forth by the non-moving party must be sufficient, taking the record as a whole, to allow a rational jury to find for the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Taylor*, 880 F.2d at 1045.

In the employment discrimination context, an employee "need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. Univ. of Cal. Davis*, 225 F.3d 1115, 1124 (9th Cir. 2000) (quoting *Schnidrig v. Columbia Mach., Inc.*, 80

F.3d 1406, 1410 (9th Cir. 1996)) (internal quotation marks omitted).  "This is because 'the ultimate question is one that can only be resolved through a searching inquiry-one that is most appropriately conducted by a factfinder, upon a full record.' " *Id.*

## DISCUSSION

This case involves a charged employment relationship that ended in the termination of Geetee Arjangrad approximately seven months after she was hired.  Arjangrad alleges claims for race/national origin discrimination, sex discrimination based on gender stereotypes, and retaliation.  I find that each survives summary judgment and decline to dismiss Arjangrad's claim for punitive damages.

## I.    Analytical Structure

Plaintiff alleges that defendant violated Title VII, ORS 659A.030, and 42 U.S.C. § 1981. As Judge Jelderks recently explained, the analysis under all these statutes is identical:

> These statutes all prohibit employers from making adverse employment decisions based upon an individual's race [or national origin]. See 42 U.S.C. § 2000e–2(a); 42 U.S.C. § 1981; Or. Rev. Stat. § 659A.030. The same legal standards apply when analyzing claims brought pursuant to any of these statutes. *See Fonseca v. Sysco Foods Servs. of Ariz. Inc.*, 374 F.3d 840, 850 (9th Cir.2004) (courts apply same legal principles in analyzing Title VII and § 1981 claims); *Snead v. Metropolitan Property & Cas. Ins. Co.*, 237 F.3d 1080, 1090 (9th Cir.2001) (under Erie doctrine, federal courts apply state substantive law and federal procedural law in actions based upon diversity); *School Dist. No. 1 v. Nilsen*, 271 Or. 461, 469, 534 P.2d 1135, 1139 (1975) (courts to construe Oregon anti-discrimination statutes and Title VII, as identical).

*DeWeese v. Cascade Gen. Shipyard*, No. 08-860-JE, 2011 WL 3298421, at *7 (D. Or. May 9, 2011).

Under the familiar *McDonnel Douglas* framework, the plaintiff carries the initial burden

Page 27- OPINION AND ORDER

to establish a *prima facie* case of discrimination. *Lindahl v. Air France,* 930 F.2d 1434, 1437 (9th Cir.1991) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)). To meet that burden, the plaintiff must offer evidence that gives rise to an inference of unlawful discrimination, either through direct evidence of discriminatory intent or through the framework set forth in *McDonnell Douglas*. *Vasquez v. County of Los Angeles,* 349 F.3d 634, 640 (9th Cir. 2003) (citation omitted). The requisite degree of proof necessary for a plaintiff to establish a *prima facie* case on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) (citation omitted).

Direct evidence of discrimination is "evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude sufficient to permit the fact finder to infer that the attitude was more likely than not a motivating factor in the employer's decision." *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 812 (9th Cir. 2004), *cert. denied*, 544 U.S. 974 (2005) "Direct evidence is 'evidence which, if believed, proves the fact of discriminatory animus without inference or presumption.' " *Vasquez*, 349 F.3d at 634 (quoting *Godwin v. Hunt Wesson, Inc.,* 150 F.3d 1217, 1221 (9th Cir. 1998)).

To establish a prima facie case using the *McDonnell Douglas* framework, a plaintiff alleging disparate treatment under Title VII must show: (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) similarly situated individuals outside her protected class were treated more favorably. *Chuang v.*

*Univ. of California Davis,* 225 F.3d 1115, 1123 (9th Cir. 2000) (internal citation omitted).  Once

a plaintiff has made her *prima facie* showing of discrimination, "[t]he burden then must shift to

the employer to articulate some legitimate, nondiscriminatory reason for the employee's

rejection." *McDonnell Douglas,* 411 U.S. at 802.  The employer "need not prove the absence of

retaliatory intent or motive; it simply must produce evidence sufficient to dispel the inference of

retaliation raised by the plaintiff." *Cohen v. Fred Meyer Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)

(citations omitted).  This is merely a burden of production as the ultimate burden of persuasion

remains with the plaintiff at all times.  *Id*. at 796-97.  Finally, if the employer articulates

legitimate reasons for its employment decision, the burden shifts back to the employee to show

that the employer's reasons were pretextual.  *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S.

248 (1981).

## II.     Scope of Claims

One preliminary concern is whether Arjangrad's responses in depositions serve to limit

the scope of her claims, either by limiting the actors alleged to harbor discriminatory animus, or

by limiting the adverse actions alleged to be either discriminatory or retaliatory.   For example,

Chase argues that Weldon is the only alleged discriminator because Arjangrad testified, over

plaintiff counsel's objections, that Kunkel never took any action against her because of her race,

national origin or gender. (D.'s Br., #77, at 19.)  Similarly, Chase argues that the written warning

and termination can only be considered under Arjangrad's retaliation claims because she did not

mention those events in her deposition as resulting from discrimination.  (D.'s Br., #77, at 19.)

Additionally, Chase notes that plaintiff's counsel stipulated in a prior oral argument on the

motion to amend that the allegations in her complaint "will not go beyond what she's testified to[.]" (Supp. Lively Decl., #129, Ex. 16) (Transcript at 51.)

I, however, agree with Arjangrad that her responses to questions in deposition do not limit the scope of employment claims because evidence of discriminatory animus may be demonstrated by many sources besides a plaintiff's own observations. *See Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 889 n.9 (D.C. Cir. 1997) ("We disagree that Aka's claims should not survive a summary judgment motion because he was unable to summarize all of his evidence in response to a question posed by the defendant during a deposition.   The factfinder will have much more than the complainant's answer to a question posed in a deposition from which to infer that the challenged employment action reflected intentional discrimination.   Furthermore, the purpose of the *McDonnell Douglas* framework is to permit victims of discrimination to secure relief even when they don't have access to direct evidence of the employer's discriminatory animus."). Further, Arjangrad's stipulation in oral argument also does narrow the claims as defendant contends.  Arjangrad made that stipulation in response to Chase's concern that plaintiff's proposed amended complaint only generally referred to "adverse employment actions" without specifying  what those adverse actions were.  Arjangrad's stipulation therefore does not limit the particular legal theories she may offer in relation to those adverse actions.  Consequently, I address Arjangrad's claims as she pleads them in her complaint and argues them on summary judgment without imposing any limitations based on her deposition testimony.

## III.    Race/National Origin Discrimination

### A.    Prima Facie Case

### 1.      Direct Evidence

The parties first dispute whether Weldon's alleged "you must hate men" comment constitutes direct evidence of national origin or race discrimination.  As described above, "[d]irect evidence is evidence which, if believed, proves the fact of discriminatory animus without inference or presumption." *Vasquez*, 349 F.3d at 634 (internal quotations omitted). Plaintiff proposes three theories of how this statement directly proves Weldon's discriminatory animus: (1) associational (Arjangrad is like Kim Tillman, another Iranian woman that Weldon worked with in Texas): (2)  patriotic (Iran is an enemy of the United States); (3) bigotry (Iranians are minorities and Weldon was a redneck who discriminated against minorities, such as RM candidate James Taylor).  I find the "you must hate men" comment to be rather ambiguous.  It could reflect any of those three attitudes, it could imply that Weldon believed Iranian culture repressed women, making Iranian women resentful of men, or it could simply imply a visceral dislike for Iranian people without an underlying justification.  On the other hand, it might also be seen as a sympathetic remark reflecting Weldon's recognition of the repression often experienced by women in Iran.  It certainly, however, requires the court to infer or presume Weldon's discriminatory animus against Iranians, which is not explicit in the comment.  *See Lahrichi v. Lumera Corp.*, 2006 WL521659 (W.D. Wash. Mar. 2, 2006) (finding comment that Muslim employee was a "guy who drags his pregnant wife from Colorado and dumps her in a sweat shop" does not raise a genuine issue of material fact as to discriminatory intent in part because it was unclear what was meant by it).  Accordingly, I would not find that the comment constitutes direct evidence of race/national origin discrimination.

Chase argues, and I agree, that this single comment uttered early in Arjangrad's employment, and unrelated to the institution of a written warning or her termination, is a stray remark that does not provide direct evidence of discriminatory animus.  "The Ninth Circuit has held a 'stray remark' that is 'uttered in an ambivalent manner and [is] not tied directly to the plaintiff's termination is insufficient to create an inference of discriminatory motive.'"  *Hartung v. Cae Newnes, Inc.*, 229 F.Supp.2d 1093, 1100 (D. Or. 2002) (quoting *Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1438-39 (9th Cir. 1990)).  However, when a comment is sufficiently egregious, even if made just once, it falls outside the realm of stray remarks.  *See Chuang*, 225 F.3d at 1128 (finding that decision-maker's laughter after an employee remarked that having "two Chinks" in the department was more than enough constituted adequate direct evidence of discriminatory intent on the part of the decision-maker even though the remark did not refer to the plaintiff and did not relate to the employment decision at issue); *Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1149 (9th Cir. 1997) (decision-maker's comment that a coworker was a "dumb Mexican" and hired because he was a minority was sufficiently egregious to constitute discriminatory animus on the basis of national origin even though the remark was not about the plaintiff or the underlying employment decision).  Even though Weldon was a decision-maker, his alleged comment in September 2009 was both ambiguous and temporally removed from the later allegedly adverse employment decisions.  The "you must hate men" comment is therefore not direct evidence of race/national origin discrimination.

### 2.    Indirect Evidence

To establish a prima facie case of disparate treatment based on race or national origin

discrimination under the *McDonnell Douglas* framework, Arjangrad must demonstrate that she: (1) belongs to a class of persons protected by Title VII; (2) performed her job satisfactorily; (3) suffered an adverse employment action; and (4) was treated differently than similarly situated employees not belonging to the same protected class. *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 (9th Cir. 2006); *Williams v. Fed. Ex. Corp.*, 211 F.Supp.2d 1257, 1262 (D.Or. 2002). Chase's summary judgment argument focuses on the third and fourth elements.

### a.      Adverse Employment Actions

Arjangrad never explicitly describes which conduct amounts to adverse employment actions. Arjangrad focuses much discussion on her December 2009 "Needs Improvement" review, her January 2010 written warning, and her March 2010 termination, but also references Chase's denial of training, failure to supervise, "singling" her out for manager attention, interfering with her work activities, manufacturing alienation from colleagues, inviting customer complaints, creating a skewed paper-trial. Chase concedes that Arjangrad's written warning and her termination can serve as adverse employment actions, but argues that any other conduct is not independently actionable.

For the purposes of a Title VII disparate treatment claim, an adverse employment action is one that "materially affects the compensation, terms, conditions, or privileges of employment." *See Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008). Arjangrad's December 2009 review rating of "Needs Improvement" rendered her ineligible for bonuses. (2nd Kunkel Dep., at 94:10-17.) Accordingly, I find that review to be an adverse employment action for Arjangrad's disparate treatment claim. The other assorted conduct– denial of training, singling

Page 33- OPINION AND ORDER

out, and the like– cannot have been said to itself materially affect Arjangrad's compensation, terms, conditions, or privileges of employment.

        **b.**        **Treated Differently Than Similarly Situated Individuals**

Chase contends that Arjangrad cannot satisfy the last element of her prima facie case because she fails to provide evidence of other RMs with performance and behavioral problems similar to Arjangrad's who were treated more favorably with respect to each alleged adverse action.   I find, however, that Arjangrad identifies comparators for two of the three adverse employment actions.

According to the Ninth Circuit, individuals are similarly situated when they have similar jobs and display similar conduct.  *Vasquez v. Cnty. of Los Angeles*, 349 F.3d 634, 641 (9th Cir. 2003) (finding employees not similarly situated when they "did not engage in problematic conduct of comparable seriousness").   However, employees in supervisory positions are not generally similarly situated to lower level employees.  *Id.*   "[W]hether a plaintiff and a coworker are similarly situated will generally be a question of fact."  *Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1161 (9th Cir. 2010).

First, Arjangrad presents evidence that Cynthia Klein, another Portland RM, exhibited some of the same problems with prospecting and partnering as Arjangrad did, yet received a much higher rating on those two categories in her 2009 performance review than Arjangrad.  Klein received an "Exceeds Expectations" for partnering while Arjangrad received a "Needs Improvement."  (Spaulding Decl., #92, Exs. 36, 109.)  In his evaluation of Klein, Weldon lauded her for developing relationships with other bankers and other branches and mentoring

new RMs.  *Id.*  By contrast, in Arjangrad's evaluation, Weldon seemed to critique Arjangrad for focusing too much on old relationships predating Chase's takeover of WAMU instead of developing new relationships as part of the RM team.  *Id.*  On their face, these appear to be meaningful differences between Klein and Arjangrad's partnering skills.  However, while discussing Arjangrad's partnering rating during deposition, Weldon explained that Arjangard's needs improvement rating in partnering was because she was a "gossip" and too "backward looking."  (2nd Weldon Dep., 59:23 - 60:3.)  Weldon admitted, however, that Klein also gossiped.  Yet Weldon did not mark her down in partnering because of that behavior.  *Id.* at 60:5 - 61:4.

Weldon's review of both RM's prospecting is also illustrative.  Most of Weldon's comments about Klein and Arjangrad's prospecting are similar– both needed to improve their number of calls, plan call agendas, and prepare with research.  (Spaulding Decl., #92, Exs. 36, 109.)  Yet Weldon praised Klein for using available data and working with partner bankers to get leads, while writing that Arjangrad "would benefit" from doing the same.  *Id.*  Klein received an "Exceeds Expectations" for Prospecting while Arjangrad received a "Needs Improvement."  *Id.*

The stark difference Klein and Arjangrad's partnering and prospecting ratings was particularly important because those were two of the tree categories Weldon used to differentiate between RMs in assigning their overall 2009 ranking.  (Weldon Decl., #85, ¶¶22-23.)  Morover, these categories are completely subjective.  Thus, making inferences favorable to Arjangrad, the record suggests Klein and Arjangrad exhibited some similar conduct but were rated much differently in their reviews.

Page 35- OPINION AND ORDER

Second, Arjangrad presents evidence that two other RMs were given much more time to improve their performance before being terminated while being monitored under a written warning. For example, Kane specifically noted that one RM referred to only as Patel was given almost three months to improve before being terminated, while an RM named Naylor was given almost two months to improve before being terminated. (1st Kane Dep., at 222:22 - 223:8); (Spaulding Decl., #92, Ex. 62.) By contrast, while Arjangrad's written warning expired in 60 days, she was recommended to be terminated less than a month after she returned to work under that warning. Although there is no evidence in the record concerning Patel and Naylor's conduct or performance during their warning periods, Patel, Naylor, and Arjangrad were all RMs subject to the same Chase standards, yet Arjangrad was terminated much more quickly than either Patel or Naylor.

Even if Arjangrad had not identified comparators, she presents sufficient evidence to satisfy the fourth element of her prima facie case as to all three adverse actions. The Ninth Circuit makes clear that comparator evidence is not required to satisfy the fourth element of a plaintiff's prima facie case when "other circumstances surrounding the adverse employment action give rise to an inference of discrimination." *Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010) (internal quotations omitted). Weldon's initial "you must hate men" comment and his allegedly sudden change in attitude towards Arjangrad provides circumstantial evidence of discrimination to support all three adverse actions. It was this change in attitude that arguably led Weldon to deny Arjangrad necessary feedback, training, and clients, which in turn led to Weldon's critical performance evaluation, overly punitive response to the Wakefield

investigation, written warning, and termination.  Even without any comparator evidence, changes

in Weldon's behavior after learning of Arjangrad's national origin would alone provide sufficient

evidence to satisfy the fourth element of Arjangrad's prima facie case, especially given the

"minimal" level of proof necessary on summary judgment.  *See* 26 F.3d at 889.

### B.    Pretext

Chase proffers numerous legitimate non-discriminatory reasons for each of the three

adverse employment actions.   With respect to the 2009 review, Chase argues that Weldon gave

Arjangrad a "Needs Improvement" rating due to her failure to record sufficient calls in Contact

Manager, her failure to research and pursue appropriate RM banking prospects, her

unprofessional behavior towards Klein at the BLC tour, and her criticism of her former

colleagues.  (Weldon Decl., #85, ¶¶22.)  Next, Chase contends that it placed Arjangrad on a

written warning because of Arjangrad's disrespectful December 22 email to Weldon, her

improper handling of the DP account (including her inappropriate personal emails with the client,

poor customer service, and failure to involve a supervisor when she was accused of having an

affair with the client), and her Arjangrad's 2009 "Needs Improvement" Review.  (Lively Decl.,

#80, Ex. 41.)  Finally, Chase posits that it terminated Arjangrad for failure to demonstrate

improvement in areas highlighted by her written warning, including: issues with client service,

follow-up, and setting client expectations; reluctance to follow Chase protocols; failure to

forward a prospect's financial information; insufficient prospecting calls; prospect list with

inappropriate prospects; missed administrative deadlines; insufficient understanding of credit

principles; and argumentativeness with management.  (Lively Decl., #80, Ex. 47.)

Page 37- OPINION AND ORDER

As an analytical principle, Chase contends that summary judgment must be granted in its favor if Arjangrad fails to create a question of fact on pretext as to each of its proffered non-discriminatory reasons. *See Odima v. Westin Tucson Hotel Co.*, 991 F.2d 595, 600 (9th Cir.1993) ("[W]here an employer articulates several alternative and independent legitimate nondiscriminatory reasons, the falsity of one does not necessarily justify the finding that the remaining articulated reasons were pretextual."); *Mihailescu v. Maryville Nursing Home*, 339 F. App'x 717, 719 (9th Cir. 2009) ("The district court also did not err by holding [employee] was required to rebut all three of [employer's] proffered legitimate, nondiscriminatory reasons for her termination."). This is true, however, only if each of Chase's proffered reasons was independent of the others and alone justified the relevant adverse employment action. *See Odima*, 991 F.2d at 600*; Richey v. City of Independence*, 540 F.3d 779, 787 (8th Cir. 2008) ("When a defendant has offered multiple nondiscriminatory reasons for an alleged discriminatory action, showing that one of these reasons is pretextual is not enough, although there may be circumstances where multiple grounds offered by the defendant are so intertwined, or the pretextual character of one of them so fishy and suspicious, that the plaintiff could withstand summary judgment.") (internal quotations omitted).

Here, I find that the three adverse actions and Chase's proffered legitimate non-discriminatory reasons for those actions are so thoroughly intertwined that Arjangrad need not demonstrate pretext for each one separately. Indeed, Weldon's discriminatory animus arguably infected Chase's decision-making throughout Arjangrad's short period of employment, with Weldon's dismissive treatment of Arjangrad initiating a chain of events that lead to all three

adverse actions.  Consequently, making all inferences favorable to Arjangrad, I find pretext both based on evidence of Weldon's discriminatory intent throughout the entire course of Arjangrad's employment and because certain of Chase's justifications for its adverse actions are unworthy of credence.  *See Chuang*, 225 F.3d at 1124. (pretext may be established in two ways: "(1) indirectly by showing that defendant's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable; or (2) directly, by showing that unlawful discrimination more likely motivated the employer.")   In light of this evidence and the Ninth Circuit's observation that employment discrimination cases are generally inappropriate for summary judgment because of the jury's role in determining the presence of discriminatory intent, I deny Chase's motion for summary judgment on Arjangrad's race/national origin claim.

Arjangrad was hired by Weldon with a stellar reputation and skills as business banker. These traits arguably carried over to her new RM role, although adapting to the new Chase RM procedures apparently posed a challenge for Arjangrad.  Within weeks of starting, Arjangrad revealed her national origin to Weldon, whose behavior towards her immediately underwent a drastic change.  Thereafter, Weldon failed to inform her of crucial RM policies, gave her contradictory instructions, dismissed her proposed deals, assumed she acted with improper motivations in the client segmentation activity, and refused to allow her to attend RM orientation training, all while tersely instructing her to continue on in the same manner.  Then, Weldon's conduct worsened when Arjangrad confronted him about his discriminatory behavior.  Soon after that, Weldon gave Arjangrad a "Needs Improvement" 2009 review based on her partnering and prospecting skills.  A reasonable jury could find that Weldon's conduct following Arjangrad's

disclosure of her national origin prevented Arjangrad from succeeding as an RM and preordained her "Needs Improvement" rating.

Moreover, the 2009 review itself is suggestive of pretext.  Chase's reliance on Arjangrad's low Contact Manager totals is suspect.  Not only was Arjangrad delayed in getting access to Contact Manager, but until December she was under the impression that only a subset of calls were to be logged into that program.  When she started logging all appropriate calls into Contact Manager, her call totals were nearly double those of her fellow RMs.  Further, although there is some contemporaneous evidence from Arjangrad's 2009 review itself that Weldon believed Arjangrad needed to improve her time management and adopt a more disciplined process for prospecting, Chase's never documents its more substantive concern about Arjangrad pursuing inappropriate clients until just before Arjangrad's termination.  Chase contends that Arjangrad has no evidence to dispute the fact that Weldon and Kunkel's honestly believed she was pursuing inappropriate clients.  But this ignores Arjangrad's testimony that in the initial months of her employment as an RM, Weldon repeatedly told Arjangrad that she was doing fine and should "[j]ust continue to do what you're doing."  Weldon's encouragement of Arjangrad's prospecting method detracts from his statements that Arjangrad constantly pursued the wrong type of clients. *See Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998) (criticizing employer's reliance on explanations after employment decision occurred when they materially conflict with evidence of contemporaneous reasons for that decision).  Moreover, as described above, Weldon's reliance on Arjangrad's gossiping in giving her a "Needs Improvement" in partnering lacks credence because Weldon did not fault Klein for similar

Page 40- OPINION AND ORDER

behavior.  In sum, it appears that Arjangrad's 2009 review lacks credence because some of

deficiencies it identified were arguably the result of Weldon's discriminatory treatment and

others were contradicted by the contemporaneous record.

    The 2009 review, in turn, became the catalyst for the events leading to Chase's two other

adverse actions.  Based on Kunkel's encouragement to her to be direct with Weldon about his

discriminatory attitude, Arjangrad wrote Weldon the December 22 email critiquing his 2009

review and his management style.  Chase's contention that this December 22 email alone

justified her being placed on written warning is belied by the record.  Chase did not initiate

disciplinary proceedings immediately after the email, nor did it work constructively with

Arjangrad to remedy her perceived insubordination.  Instead, Weldon addressed Arjangrad's

email during a contentious in-person public meeting, at which Weldon silenced and mocked

Arjangrad, encouraging her to quit.

    Just a few days later, Weldon received complaints about Arjangrad's handling of the DP

account, alleging she committed fraud and engaged in an inappropriate romantic relationship.

Although the investigation found Arjangrad did not commit fraud or have an affair as alleged,

Chase HR representative Kane began considering terminating Arjangrad because her failure to

seek help from Chase managers in responding to an accusation of an affair put the client

relationship in danger.  Although the initial allegations were severe, the investigator's eventual

conclusions revealed much more attenuated misconduct, at worst.  Yet Kane, Weldon and

Kunkel pushed forward with recommending termination, piling on the 2009 review and

Arjangrad's December 22 email as additional justifications.  Indeed, even before the

Page 41- OPINION AND ORDER

investigation concluded, Weldon told others Arjangrad had been fired, which again undercuts Chase's contention that the results of the investigation warranted discipline. Moreover, Chase's refusal to terminate Arjangrad at that point and Lyden's decision to place her on a written warning also suggests the deficiency of Kane, Kunkel, and Weldon's justifications. In light of Weldon's animosity towards Arjangrad, the pretext inherent in Weldon's 2009 review, Chase's handling of the December 22 email to Weldon, and the push for termination even without substantiation of the fraud or the affair, a reasonable jury could find that Chase's decision to impose a written warning was also infected by Weldon's discriminatory intent.

Given that Kane, Weldon, and Kunkel lobbied for Arjangrad's termination, their further participation in monitoring Arjangrad's progress under the written warning calls into question the legitimacy of the justifications they later offered for recommending termination. Indeed, from the beginning of the written warning period, Weldon and Kunkel appeared prepared to find fault in Arjangrad's slightest misstep. Weldon's  interference with Arjangrad's ability to meet the written warning expectations, his creation of the paper trail that was used to justify her termination, and his ultimate recommendation for termination detract from the credence of Chase's termination decision. Kane's after-the-fact manipulation of Weldon's request for termination to add unsupported production tallies further detracts from the credence of Chase's termination decision. Moreover, Weldon's reliance on Arjangrad's 2009 performance review, the December 22 email, and the results of the Wakefield investigation in support of the termination are all suspect for the same reasons as described  above. In sum, a reasonable jury could determine that Weldon, Kunkel, and Kane set the termination process in motion well before

Page 42- OPINION AND ORDER

Arjangrad returned to work under her written warning, that they built a case for Arjangrad's termination during the first month of the warning period, and that Chase's stated reasons justifying Arjangrad's termination were unbelievable, all of which provides sufficient evidence of pretext for unlawful discrimination.

In addition, I disagree with Chase that the "same actor" inference precludes any finding that Weldon's justifications were pretext for discrimination. The Ninth Circuit has observed that a putative discriminator is unlikely to hire an employee from a group he dislikes only to then fire that employee once on the job. *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270 (9th Cir. 1996) (citing *Proud v. Stone*, 945 F.2d 796, 797 (4th Cir.1991)). Thus, "where the same actor is responsible for both the hiring and the firing of a discrimination plaintiff, and both actions occur within a short period of time, a strong inference arises that there was no discriminatory motive." *Id.* at 270-271. Although Weldon both hired and recommended terminating Ajrangrad, Weldon did not know about Arjangrad's Iranian national origin until after she began working. Thus, Chase cannot satisfy the predicate for the "same actor" inference– Weldon's knowledge that Arjangrad was Iranian– since Weldon knew only that Arjangrand was "diverse" and belonged to an ethnic minority before hiring her.

## IV.    Retaliation

To establish a prima facie case of retaliation under Title VII, a plaintiff must show: (1) involvement in a protected activity; (2) an adverse employment action; and (3) a causal link between the two. *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000). The *McDonnell Douglas* burden-shifting model also applies to retaliation claims, requiring the

Page 43- OPINION AND ORDER

employer to present legitimate reasons for an adverse action and the plaintiff to demonstrate a genuine issue of material fact as to whether the reason advanced by the employer was a pretext. *Id.* Chase challenges the second and third elements of Arjangrad's prima facie case, arguing that only the written warning and termination qualify as adverse employment actions and contending that there is no causal nexus between those actions and Arjangrad's protected activity.

## A.    Adverse Actions

Although I agree with Chase that Arjangrad cannot rely on conduct prior to her first complaint of discrimination, I disagree that Arjangrad's 2009 review cannot be considered an adverse action. For the purposes of a Title VII retaliation claim, "an action is cognizable as an adverse employment action if it is reasonably likely to deter employees from engaging in protected activity." *Ray v. Henderson*, 217 F.3d 1234, 1243 (9th Cir. 2000). Moreover, "undeserved performance ratings, if proven, would constitute 'adverse employment decisions.'" *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000) (quoting *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987)). Accordingly, Arjangrad's 2009 review, written warning, and termination are all adverse actions forming the basis for her retaliation claim.

## B.    Causation

To show a causal link between protected activity and retaliation by an employer, a plaintiff must at least raise an inference that the employer was aware the plaintiff had engaged in protected activity and that the protected activity was the likely reason for the adverse action. *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 798 (9th Cir.1982). Courts may infer causation based only on temporal proximity between the protected activity and the adverse action where the

retaliation "follows on the heels" of the protected activity. *Villarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002). Here, Chase does not dispute the temporal proximity between Arjangrad's complaints of discrimination and the various adverse employment actions. All occurred within a short window of a few months. Arjangrad's first complaint to Weldon occurred on November 2, 2009, about three weeks before he prepared her 2009 performance review. Arjangrad reported Weldon's discrimination to Kunkel on December 17, 2009, and to Kane on January 13, 2010, shortly before Weldon, Kunkel, and Kane recommended Chase terminate Arjangrad around January 20, 2010.

Instead, Chase argues that since Arjangrad's performance concerns arose before her first complaint of discrimination, Chase's continuation of performance management after that protected activity does not create an inference of retaliation, even despite the close temporal proximity.[12] *See Hervey v. Cnty. of Koochiching*, 527 F.3d 711, 723 (8th Cir. 2008) ("Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity."); *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir.2001) ("Where timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.") Although the record indicates that Chase was concerned about Arjangrad's performance initially, it did not take any concrete disciplinary steps to address those issues with her until the 2009 written

_____

[12] Chase refers to the fact that by late October 2009, Weldon was concerned with Arjangrad's gossip, Weldon ranked Arjangrad as the lowest of his three RMs, Weldon doubted Arjangrad's honesty because of the segmentation project, and Weldon knew Arjangrad was behind on Contact Manager entries.

review.  Given the low threshold for prima facie proof, I find that Arjangrad produces sufficient

evidence to make out a prima facie case of retaliation.

### C.    Pretext

As an initial matter, I disagree with Arjangrad's suggestion that there is direct evidence of

retaliation such that she need not establish pretext under the *McDonnell Douglas* framework,

merely because Kane notified senior management of Arjangrad's proposed termination precisely

because of Arjangrad's pending discrimination complaint.  The record shows that Kane informed

Von Kapff of Arjangrad's case so that Chase could make its decision about Arjangrad's

discipline thoughtfully and professionally, given her discrimination allegation.  Indeed, the

upper-management's decision to not follow Kane's recommendation to terminate Arjangrad after

being informed that she raised a discrimination complaint is strong evidence that Chase acted

without a retaliatory motive, at least in placing Arjangrad on a written warning.  *Cf. Enlow v.

Salem–Keizer Yellow Cab Co., Inc.*, 389 F.3d 802, 812 (9th Cir. 2004) (Direct evidence is

"evidence of conduct or a statement by persons involved in the decision-making process that may

be viewed as directly reflecting the alleged the discriminatory attitude.")

Chase contends that it has provided numerous legitimate non-retaliatory reasons for

taking its adverse actions against Arjangrad.  Because I have already discussed these

justifications above, I need not repeat that pretext analysis here.  It is nearly impossible to

differentiate between the effects of Weldon's putative discriminatory and retaliatory animus,

since Arjangrad confronted Weldon directly about his national origin discrimination fairly early

on in her employment.  In concluding that Arjangrad provides sufficient evidence of pretext to

create a jury issue, I do not rely on Arjangrad's expert testimony concerning the sufficiency of

Chase's discrimination investigation.  Thus, I decline to address Chase's motion to strike the

expert report of Paul Buchanan (#125) for the moment and will take it up separately.

## V.    Sex Discrimination

Arjangrad alleges that Chase discriminated against her because of "the convergence" of

several different gender stereotypes: (1) women as submissive; and (2) women as flirtatious; (3)

women as emotional; and (4) women as gossipy.   Chief Judge Aiken recently explicated the

standard for such sex stereotyping claims:

> To make a prima facie case for sex discrimination under Title VII, a plaintiff must show
> that "the challenged employment action was either intentionally discriminatory or that it
> had a discriminatory effect on the basis of gender." *Jespersen v. Harrah's Operating Co.*,
> 444 F.3d 1104, 1109-10 (9th Cir.2006). "In establishing that 'gender played a motivating
> part in an employment decision,' a plaintiff ... may introduce evidence that the
> employment decision was made in part because of a sex stereotype." *Id.* at 1111 (quoting
> *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-51, 109 S.Ct. 1775, 104 L.Ed.2d 268
> (1989)). Thus, plaintiff can show gender discrimination if there is evidence that he was
> treated differently because he failed to "conform to commonly-accepted gender
> stereotypes." *Id.* at 1112-13. If plaintiff presents a prima face case, the burden shifts to
> defendant to articulate "some legitimate, nondiscriminatory reasons for plaintiff's
> rejection." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36
> L.Ed.2d 668 (1973). If defendant does so, the burden shifts back to plaintiff to show that
> defendant's reasons are pretextual. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S.
> 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

*Holte v. Steiner Corp.*, No. 08-1329-AA, 2010 WL 1779965, at *7 (D. Or. Apr. 27, 2010).  Thus,

Arjangrad must first present prima facie evidence that her failure to conform to one or several

"commonly-accepted" gender stereotypes "played a motivating part" in Chase's decision to place

her on a written warning, and terminate her.[13]

---

[13] Arjangrad's December 2009 performance review cannot serve as an independent
adverse employment action for sex discrimination because it is time barred.  Arjangrad filed her

Arjangrad's sex stereotype claim is ill-focused.  I address the final three stereotypes first.

Even assuming that being flirtatious, emotional, and gossipy are commonly accepted female

stereotypes, the record indicates (and Arjangrad does not dispute) that she acted somewhat in

conformity with those stereotypes.  She admitted engaging in informal email conversations with

the DP client to ensure rapport was maintained, she became tearful on several occasions, and she

talked to Weldon and others about former colleagues.  Perhaps Arjangrad means to assert sex

stereotypes based on the converse– that women are expected to be prudish, unemotional, and

formal and that she did not conform to those expectations.  Either way, Arjangrad fails to present

any authority recognizing these as commonly accepted female norms.  Unlike in *Price

Waterhouse*, where the Supreme Court recognized "stereotypical notions about women's proper

deportment" to include a polished physical appearance and pleasant demeanor, 490 U.S. at 256, I

cannot so easily find Arjangrad's final three proposed gender stereotypes to be commonly

accepted.

Arjangrad's contention that shew was discriminated against for failing to assume the

typically submissive female role is different.  *See Price Waterhouse*, 490 U.S. at 250 ("an

employer who acts on the basis of a belief that a woman cannot be aggressive, or that she must

not be, has acted on the basis of gender.").  This Court recognizes the role Title VII plays in

freeing women from the "intolerable and impermissible catch 22" of "an employer who objects

to aggressiveness in women but whose positions require this trait . . . ." *Id.* at 251.  In addition, I

---

BOLI complaint alleging sex discrimination on November 22, 2010.  (Lively Decl., #80, Ex. 49.)
Any conduct occurring more than 300 days before that filing (i.e. before January 26, 2010) is not
actionable under Title VII.  *See Surrell v. California Water Service Co.*, 518 F.3d 1097, 1103
(9th Cir. 2008).

am instructed to scrutinize language that hints at the presence of sex stereotyping based on

women's failure to assume a submissive role.  *See Stegall v. Citadel Broad. Co.*, 350 F.3d 1061,

1072 (9th Cir. 2003) ("Lastly, our decision comes after careful scrutiny of the record and in due

regard of the history of discrimination against women in the workplace.  Throughout the record,

both Marathon and Citadel management repeatedly echoed the all too familiar complaints about

assertive, strong women who speak up for themselves:  'difficult,' 'negative attitude,' 'not a team

player,' 'problematic.'  The district courts must reject such sexual stereotypes and learn to

identify the oft employed rhetoric that could reveal illegitimate motives.")

I agree with Chase that Arjangrad does not present direct evidence that her aggressive

comportment motivated Chase to either place her on a written warning or terminate her.  Unlike

in *Price Waterhouse*, here there is no indication of Weldon, Kunkel, or Kane making overtly

gender-based comments in the decision-making context that would directly prove gender

stereotype discrimination without inference or presumption.

However, I note that Weldon and Kunkel repeatedly criticized her aggressive,

argumentative, and contentious demeanor, which a jury could reasonably view as evidence of

their intolerance of her non-conformity with the submissive female stereotype.  In fact, the record

contains many such comments by Weldon in his notes of coaching sessions with Arjangrad and

Kunkel during the last few weeks of her employment.  (Spaulding Decl., #92, Ex. 79,

JPMC001511, 1153, 1535 1560) ("Argumentative,"  "Once again you interrupted me. Behavior

and expectation. Argumentative. Debating everything." "Arguing does not help you vs your

evaluation,"  "Even trying to explain she argued."  "Don't fight it . . . be good corp. soldier."  )

Weldon also expressed similar frustration with Arjangrad's demeanor in their discussion of Arjangrad's 2009 review.  (Second Weldon Dep., 26:18- 27:4) ("rather than hear the constructive aspects of what I was attempting to communicate, Gettee got rather argumentative . . .").  Most importantly, there is evidence that Chase relied on this type of criticism in taking its adverse actions.  Arjangrad's written warning lists "[c]ommunicated disrespectfully with manger in disputing performance evaluation" as one of the reasons for imposition of the warning, referring to Arjangrad's December 22nd email.  (Lively Decl., #80, Ex. 41.)  Weldon's termination recommendation is even more explicit, citing her "continued and increasing argumentativeness with management during the last 5 weeks, in a manner inappropriate for a Vice President and not constructive for improving her or the business performance."  (Lively Decl., #80, Ex. 47, at 2.)  By contrast, Chase presents evidence that other female RMs disagreed with Weldon and exhibited their strong personalities, yet still had good working relationships with him.  This illustrates an alternative interpretation – that Weldon disliked Arjangrad's demeanor because it was simply too aggressive, not because it was unfeminine.  Given my previous finding that Arjangrad creates a genuine issue on the question of pretext on these adverse actions, her gender stereotyping claim based on the stereotype of women as submissive is  appropriate for consideration by a jury.

**VI.    Punitive Damges**

Chase argues that this court should dismiss Arjangrad's claim for punitive damages because she fails to present evidence to satisfy the test in *Kolstad v. American Dental Ass'n*, 527 U.S. 526 (1999) requiring a plaintiff to show that her employer engaged in discriminatory

practices with malice or reckless indifference to her federally protected rights. *Id.* at 534. To meet this standard "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.* at 536. "[I]n general, intentional discrimination is enough to establish punitive damages liability." *Passantino v. Johnson & Johnson Consumer Prods., Inc.*, 212 F.3d 493, 515 (9th Cir. 2000). Punitive damages may not be available despite intentional discrimination where the employer is unaware of the relevant federal prohibition, discriminates with the distinct belief that its discrimination is lawful, discriminates under a novel or poorly recognized theory of discrimination, or reasonably believes that its discrimination satisfies a bona fide occupational qualification defense or other statutory exception to liability. *Kolstad*, 527 U.S. at 537. All of these exceptions "occur when the employer is aware of the specific discriminatory conduct at issue, but nonetheless reasonably believes that conduct is lawful." *Passantino*, 212 F.3d at 515. None of these exceptions are present in this case. Rather, the existence of factual disputes concerning the decision-makers' discriminatory and retaliatory animus raise the possibility that punitive damages are appropriate.

## CONCLUSION

For the reasons discussed above, Chase's motion for summary judgment (#76) is denied.

IT IS SO ORDERED.

Dated this 9th day of April, 2012.


  /s/ Paul Papak                            
Honorable Paul Papak
United States Magistrate Judge



Page 51- OPINION AND ORDER